**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| FREDY SOSA and ROHITH AMRUTHUR, individually and on behalf of all others similarly situated,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>ONFIDO, INC., a Delaware corporation,<br><br>     *Defendant*. | Case No.: 20-cv-04247<br><br>Honorable Marvin E. Aspen |

**<u>PLAINTIFFS' MOTION FOR AND MEMORANDUM IN SUPPORT OF
PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT</u>**

## TABLE OF CONTENTS

I.        INTRODUCTION.................................................................................1

II.      FACTUAL AND PROCEDURAL BACKGROUND .................................3

        A.     Illinois' Biometric Information Privacy Act ........................................3

        B.     Onfido's Identity Verification Service ..................................................5

        C.     Litigation, Negotiation, and Settlement ...............................................6

III.     SETTLEMENT TERMS.......................................................................8

        A.     Class Definition ....................................................................................9

        B.     Settlement Payments ..........................................................................10

        C.     Prospective Relief ..............................................................................10

        D.     Payment of Settlement Notice and Administrative Costs ................11

        E.     Payment of Attorneys' Fees, Costs, and Incentive Award ..............11

        F.     Release of Liability ............................................................................12

IV.    THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED SETTLEMENT AND DIRECT NOTICE TO THE PROPOSED SETTLEMENT CLASSES .........................................................................................12

        A.     The Settlement Classes Can Be Certified .........................................12

               1.     Both classes are too numerous to permit individual joinder ..............13

               2.     Common questions predominate over any individual questions within the claims of both proposed Settlement Classes ...................................14

                     i.     Questions common to both classes...............................................14

                     ii.    The additional common question inherent in the claims of the Financial Institutions Class ........................................................16

               3.     Plaintiffs are typical of the classes they proposed to represent ..........17

               4.     Plaintiffs and their lawyers are adequate to represent the proposed Settlement Classes ............................................................................18

5.      A class action is the superior way to resolve this controversy ............22

6.      The Settlement Classes are ascertainable ................................................23

**B.**     **The Court Should Preliminarily Approve the Proposed Settlement** .............24

1.      The Classes have been adequately represented ...................................24

2.      The Settlement was the product of arm's length negotiation ............26

3.      The Settlement secures outstanding relief in the face of serious risks should this case proceed to trial ..........................................................26

i.      The Settlement Classes face substantial obstacles to recovery ......27

ii.      The Settlement secures outstanding relief despite these risks .......30

iii.      The method of distributing recovery is fair.....................................32

iv.      The Settlement caps any award of attorneys' fees at a reasonable amount, and any amount awarded below that cap will be distributed to class members.............................................................33

v.      There are no side agreements separate from the Settlement Agreement...........................................................................................34

4.      The Settlement treats members of all classes equitably ......................34

**C.**     **The Court should approve the form and manner of Notice contemplated by the Settlement, and order that Notice be disseminated to the Settlement Classes** ................................................................................................................36

**V.**     **CONCLUSION** .................................................................................................38

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)....................................................................22

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
    568 U.S. 455 (2013)....................................................................13

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)....................................................................36

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................14, 22

**United States Circuit Court of Appeals Cases**

*Beaton v. SpeedyPC Software*,
    907 F.3d 1018 (7th Cir. 2018) ................................................14, 17

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*,
    797 F.3d 426 (7th Cir. 2015) .......................................................14

*De La Fuente v. Stokely–Van Camp, Inc.*,
    713 F.2d 225 (7th Cir.1983) ...................................................17, 18

*Gomez v. St. Vincent Health, Inc.*,
    649 F.3d 583 (7th Cir. 2011) .......................................................19

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) .......................................................31

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ...................................................13, 23

*Mulvania v. Sheriff of Rock Island Cnty.*,
    850 F.3d 849, 859 (7th Cir. 2017) .................................................13

*Patel v. Facebook, Inc.*,
    932 F.3d 1264 (9th Cir. 2019) .............................................13, 16, 20

*Retired Chi. Police Ass'n v. City of Chi.*,
    7 F.3d 584 (7th Cir. 1993) ..........................................................18

*Sosa v. Onfido, Inc.*,
    8 F.4th 631 (7th Cir. 2021) .......................................................................7

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ...................................................................14

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ...................................................................27

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ...................................................................33

## United States District Court Cases

*Adkins v. Facebook, Inc.*,
    No. 18-cv-05982-WHA (N.D. Cal. May 6, 2021) .......................................2

*Adkins v. Facebook, Inc.*,
    No. 18-cv-05982-WHA (N.D. Cal. July 13, 2021) ......................................2

*Alvarado v. Int'l Laser Prods., Inc.*,
    No. 18-cv-7756 (N.D. Ill. Jan. 24, 2020) .................................................33

*Bynum v. Cmty. Loans of Am., Inc.*,
    20-CV-1564-PP, 2022 WL 10073493 (E.D. Wis. Oct. 17, 2022) ....................26

*Conde v. Open Door Mktg. LLC*,
    223 F. Supp. 3d 949 (N.D. Cal. 2017) .....................................................18

*Davis v. Jumio Corp.*,
    No. 22-CV-00776, 2023 WL 2019048 (N.D. Ill. Feb. 14, 2023) ....................29

*Dixon v. Washington & Jane Smith Cmty.-Beverly*,
    No. 17-cv-8033 (N.D. Ill. May 31, 2018) ..................................................35

*Figueroa v. Kronos Inc.*,
    No. 19-cv-01306, dkt. 380 (N.D. Ill. Dec. 20, 2022) ..............................2, 33

*Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374,
    No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ......................27

*Gumm v. Ford*,
    No. 5:15-cv-41-MTT, 2019 WL 479506 (M.D. Ga. Jan. 17, 2019) ................24

*Hudson v. Libre Tech., Inc.*,
    No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060 (S.D. Cal. 2020) ................30

*In re Facebook Biometric Info. Priv. Litig.*,
   No. 15-cv-3747-JD, 2021 WL 757025 (N.D. Cal. Feb. 26 2021) ...................................20

*In re Facebook Biometric Info. Priv. Litig.*,
   No. 15-cv-3747-JD , 2018 WL 2197546 (N.D. Cal. May 14, 2018)................................27

*In re Google Buzz Priv. Litig.*,
   No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011)..................................31

*In re Google LLC Street View Elec. Commc'ns Litig.*,
   No. 10-md-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020)...........................1

*Lopez-McNear v. Superior Health Linens, LLC*,
   No. 19-cv-2390 (N.D. Ill. Apr. 27, 2021) ........................................................................33

*Martinez v. Nandos Rest. Grp., Inc.*,
   No. 19-cv-07012 (N.D. Ill. Oct. 27, 2020) .......................................................................35

*McGoveran v. Amazon Web Servs., Inc.*,
   No. CV 20-1399-LPS, 2021 WL 4502089 (D. Del. Sept. 30, 2021)................................28

*Osada v. Experian Info. Sols., Inc.*,
   290 F.R.D. 485 (N.D. Ill. 2012)........................................................................................19

*Quiroz v. Revenue Prod. Mgmt., Inc.*,
   252 F.R.D. 438 (N.D. Ill. 2008)........................................................................................19

*Rogers v. BNSF Ry. Co.*,
   19 C 3038, 2022 WL 854348 (N.D. Ill. Mar. 22, 2022).......................................12, 15, 23

*Schulte v. Fifth Third Bank*,
   No. 09-CV-6655, 2010 WL 8816289 (N.D. Ill. Sept. 10, 2010) ......................................26

*Snyder v. Ocwen Loan Servicing, LLC*,
   No. 14 c 8461, 2019 WL 2103379 (N.D. Ill. May 14, 2019) ......................................24, 26

*Starr v. Chi. Cut Steakhouse*,
   75 F. Supp. 3d 859 (N.D. Ill. 2014) ..................................................................................18

*Thome v. Novatime Tech., Inc.*,
   No. 19-cv-6256 (N.D. Ill. Mar. 8, 2021)...........................................................................31

*T.K. through Leshore v. Bytedance Tech. Co., Ltd.*,
   No. 19-cv-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022) ..........................................23

*Vance v. Amazon.com, Inc.*,
    No. C20-1084JLR, 2022 WL 12306231 (W.D. Wash. Oct. 17, 2022)...........................28

*Wahl v. Midland Credit Mgmt., Inc.*,
    243 F.R.D. 291 (N.D. Ill. 2007).......................................................................22

*Ziemack v. Centel Corp.*,
    163 F.R.D. 530 (N.D. Ill. 1995).......................................................................18

**State Supreme Court Cases**

*Avery v. State Farm Mut. Auto Ins. Co.*,
    835 N.E.2d 801 (Ill. 2005)..............................................................................28

*Cothron v. White Castle Sys., Inc.*,
    2023 IL 128004.............................................................................................29

*McDonald v. Symphony Bronzeville Park LLC*,
    2022 IL 126511.............................................................................................20

*Rosenbach v. Six Flags Ent. Corp.*,
    2019 IL 123186...............................................................................................5

**State Appellate Court Cases**

*Rottner v. Palm Beach Tan, Inc.*,
    2019 IL App (1st) 180691-U ..........................................................................20

*Sekura v. Krishna Schaumburg Tan, Inc.*,
    2018 IL App (1st) 180175 ..............................................................................20

**State Circuit Court Cases**

*Carroll v. Crème de la Crème, Inc.*,
    2017-CH-01624 (Cir. Ct. Cook Cnty.). .......................................................2, 31

*Kusinski v. ADP LLC*,
    2017-CH-12364 (Cir. Ct. Cook Cnty.). .......................................................2, 31

*Lark, et al v. McDonald's USA, LLC, et al.*,
    No. 17-L-559 (Cir. Ct. St. Clair Cnty.) ..........................................................33

*Licata v. Facebook, Inc.*,
    2015-CH-05427 (Cir. Ct. Cook Cnty.). ...........................................................19

*Marshall v. Lifetime Fitness, Inc.*,
  2017-CH-14262 (Cir. Ct. Cook Cnty.). ........................................................2, 31

*Miracle-Pond v. Shutterfly*,
  2019-CH-07050 (Cir. Ct. Cook Cnty.) ........................................................2, 31

*Prelipceanu v. Jumio Corp.*,
  2018-CH-15883 (Cir. Ct. Cook Cnty.). .................................................2, 31, 33

*Rosenbach v. Six Flags Ent. Corp.*,
  2016-CH-00013 (Cir. Ct. Lake Cnty.) ............................................................32

*Sekura v. L.A. Tan Enters., Inc.*,
  2015-CH-16694 (Cir. Ct. Cook Cnty.). ...........................................................20

*Zepeda v. Intercontinental Hotels Grp., Inc.*,
  2018-CH-02140 (Cir. Ct. Cook Cnty.). ...........................................................33

**Miscellaneous Authority**

740 ILCS 14 ....................................................................................... *passim*

Fed. R. Civ. Proc. 23 ........................................................................... *passim*

Ill. House Transcript, 2008 Reg. Sess. No. 276 ...............................................4

Diana Novak Jones, *Illinois Powerhouse: Edelson PC*,
  Law360 (Aug. 28, 2018), https://www.law360.com/articles/1076447/illinois-
  powerhouse-edelson-pc..............................................................................20

Diana Novak Jones, *Illinois Powerhouse: Edelson PC*,
  Law360 (October 5, 2017), https://edelson.com/wp-content/uploads/2016/05/Illinois-
  Powerhouse-Edelson-PC.pdf .......................................................................20

Lauraann Wood, *Illinois Powerhouse: Edelson*,
  Law360 (Sept. 3, 2019), https://www.law360.com/articles/1193728/illinois-powerhouse-
  edelson ......................................................................................................20

*Law360 Names Practice Groups of the Year*,
  Law360 (Jan. 11, 2023), https://www.law360.com/articles/1562154 .............................20

Matt Marshall, *Pay By Touch In Trouble, Founder Filing For Bankruptcy*,
  Venture Beat, available at http://goo.gl/xT8HZW ..........................................3

Meg Marco, *Creepy Fingerprint Pay Processing Company Shuts Down*,
  Consumerist, available at https://goo.gl/rKJ8oP ............................................3

Parker Quinlan, *Cybersecurity & Privacy Group Of The Year: Edelson*,
Law360 (Feb. 21, 2023), https://www.law360.com/articles/1567512/cybersecurity-
privacy-group-of-the-year-edelson ...................................................................................20

1 NEWBERG ON CLASS ACTIONS
§ 3:75 (6th ed. 2022) .........................................................................................21

2 NEWBERG ON CLASS ACTIONS
§ 4:69 (6th ed. 2022) .........................................................................................22
§ 4:70 (6th ed. 2022) .........................................................................................23

4 NEWBERG ON CLASS ACTIONS
§ 13:1 (6th ed. 2022) .........................................................................................12

## I.     INTRODUCTION

The Settlement presented here by the Plaintiffs is an ingenious resolution to litigation that presented several tricky issues, against the backdrop of an evolving legal landscape and a defendant who lacks the resources to immediately fund a settlement yet at the same time remains a going concern. The Settlement was reached after Defendant Onfido Inc. ("Defendant" or "Onfido") took an unsuccessful appeal to the Seventh Circuit seeking to force the case to arbitration, lost its bid to dismiss the case on the pleadings, and after months of vigorous, arm's-length negotiations. At the end of the day, Onfido has agreed to deposit $28.5 million into two non-reversionary settlement funds to resolve the claims of two classes concerning the use of Onfido's facial-recognition software. Members of one of these classes (the "Non-Financial Institution Class" or "NFI Class"), against whom Onfido lacks many, if any, colorable defenses to liability, who submit a simple claim form are estimated to receive between $210 and $350, assuming a claims rate between 15% and 25%.[1] Members of the other class (the "Financial Institution Class" or "FI Class"), against whom Onfido has at least one substantial defense to liability, who submit a simple claim form are estimated to receive between $65 and $110, assuming a claims rate between 15% and 25%.

Compared against other privacy cases, this Settlement provides an exceptional amount of monetary relief to members of both of the proposed classes. Privacy cases often settle for very little, if any, meaningful monetary relief. *E.g.*, *In re Google LLC Street View Elec. Commc'ns Litig.*, No. 10-md-02184-CRB, 2020 WL 1288377, at *11–14 (N.D. Cal. Mar. 18, 2020) (approving, over objections of class members and state attorney general, a settlement providing

---

[1]     The capitalized terms used in this motion are those used in the Class Action Settlement Agreement (the "Settlement" or "Agreement"), attached hereto as Exhibit 1.

1

only *cy pres* relief for violations of Electronic Communications Privacy Act); *Adkins v. Facebook, Inc.*, No. 18-cv-05982-WHA, dkts. 350, 369 (N.D. Cal. May 6, 2021 and July 13, 2021) (approving settlement for injunctive relief only, in class action arising out of Facebook data breach, and granting $6.5 million in attorneys' fees and costs). This is true even of settlements under the Biometric Information Privacy Act ("BIPA"), despite, as explained below, the potential availability of meaningful statutory damages. *E.g.*, *Carroll v. Crème de la Crème, Inc.*, 2017-CH-01624 (Cir. Ct. Cook Cnty. June 25, 2018) (providing only credit monitoring). And still other BIPA settlements have capped monetary relief at a certain amount, with the inevitable remaining settlement funds reverting to the defendant. *E.g.*, *Marshall v. Lifetime Fitness, Inc.*, 2017-CH-14262 (Cir. Ct. Cook Cnty. July 30, 2019) ($270 per claimant with credit monitoring, reverting unclaimed funds to defendant). Even compared against the better BIPA settlements of this size (i.e., involving classes with hundreds of thousands of members), and which establish a non-reversionary settlement fund, this Settlement's approximately $28.5 million in monetary relief is in line with—and, in many instances, better than—its predecessors. *See, e.g.*, *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($7 million fund for approximately 260,000 class members); *Miracle-Pond v. Shutterfly*, 2019-CH-07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ($6.75 million fund for potentially millions of class members); *Kusinski v. ADP, LLC.*, 2017-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) ($25 million fund for approximately 320,000 class members); *Figueroa v. Kronos Inc.*, No. 19-cv-01306, dkt. 380 (N.D. Ill. Dec. 20, 2022) ($15,276,227 fund originally negotiated for 171,643 class members).

Given the relief afforded by this Settlement, the Court should not hesitate to preliminarily find that it is fair, reasonable, and adequate. Likewise, as explained below, the Court should have

no issue certifying the two proposed Settlement Classes for settlement purposes, and approving both the form and manner of notice proposed by the Settlement. Accordingly, Plaintiffs respectfully move this Court for an order certifying the proposed Settlement Classes for settlement purposes, appointing Plaintiff Fredy Sosa to represent the Non-Financial Institution Class, appointing Plaintiff Rohith Amruthur to represent the Financial Institution Class, appointing J. Eli Wade-Scott and Schuyler Ufkes of Edelson PC as Class Counsel for the proposed Settlement Classes, preliminarily approving the Settlement, and ordering that notice be disseminated to the Settlement Classes.

## II. BACKGROUND

Plaintiffs first provide a brief summary of the BIPA, the case, and the litigation history, in order to give context to the Settlement currently before the Court.

### A. Illinois's Biometric Information Privacy Act

In the early 2000s, a company called Pay By Touch began installing fingerprint-based checkout terminals at grocery stores and gas stations in major retailers throughout the State of Illinois to facilitate consumer transactions. (First Am. Compl. ("FAC"), Dkt. 64 ¶ 14.) The premise was simple: swipe your credit card and let the machine scan your index finger, and the next time you buy groceries or gas, you won't need to bring your wallet—you'll just need to provide your fingerprint. But by the end of 2007, Pay By Touch had filed for bankruptcy. (*Id.* ¶ 15.) When Solidus, Pay By Touch's parent company, began shopping its database of Illinois consumers' fingerprints as an asset to its creditors, a public outcry erupted.[2] Though the

---

[2] *See*, *e.g.*, Meg Marco, *Creepy Fingerprint Pay Processing Company Shuts Down*, CONSUMERIST, available at https://goo.gl/rKJ8oP (last accessed Mar. 9, 2023); Matt Marshall, *Pay By Touch In Trouble, Founder Filing For Bankruptcy*, VENTURE BEAT, available at http://goo.gl/xT8HZW (last accessed Mar. 9, 2023).

bankruptcy court eventually ordered Pay By Touch to destroy its database of fingerprints (and their ties to credit card numbers), the Illinois Legislature took note of the grave dangers posed by the irresponsible collection and storage of biometric data without any notice, consent, or other protections. *See* Ill. House Transcript, 2008 Reg. Sess. No. 276.

Recognizing the "very serious need" to protect Illinois citizens' biometric data—which includes retina scans, fingerprints, voiceprints, and scans of hand or face geometry—the Illinois legislature unanimously passed BIPA in 2008 to provide individuals recourse when companies fail to appropriately handle their biometric data in accordance with the statute. (*See* FAC ¶ 16; 740 ILCS 14/5.) Thus, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information . . . ."

740 ILCS 14/15(b). BIPA also establishes standards for how companies must handle Illinois consumers' biometric data, requiring companies to develop and comply with a written policy establishing a retention schedule and guidelines for permanently destroying biometric data. 740 ILCS 14/15(a). To enforce the statute, BIPA provides a civil private right of action and allows for the recovery of statutory damages in the amount of $1,000 for negligent violations—or

$5,000 for willful violations—plus costs and reasonable attorneys' fees. *See* 740 ILCS 14/20. Reflective of the nuanced approach taken by the Legislature in dealing with the issue of regulating biometrics, certain types of defendants are exempted from liability under the BIPA. As relevant here, the law exempts from liability "financial institution[s] or an affiliate of a financial institution that is subject to Title V of the federal Gramm-Leach-Bliley Act of 1999 and the rules promulgated thereunder." 740 ILCS 14/25(c).

As the Illinois Supreme Court assessed the legislature's intent in passing BIPA, the statute:

> vests in individuals and customers the right to control their biometric information by requiring notice before collection and giving them the power to say no by withholding consent. . . . These procedural protections are particularly crucial in our digital world because technology now permits the wholesale collection and storage of an individual's unique biometric identifiers—identifiers that cannot be changed if compromised or misused. When a private entity fails to adhere to the statutory procedures . . . the right of the individual to maintain her biometric privacy vanishes into thin air. The precise harm the Illinois legislature sought to prevent is then realized. This is no mere technicality. The injury is real and significant.

*Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 34 (internal citations and quotations omitted).

### B.     Onfido's Identity Verification Service

Onfido provides biometric identification software that is designed to be seamlessly integrated into its customers' smartphone applications. (FAC ¶ 23.) Typically, a customer will be asked to upload an image of their driver's license (or other identification) and an image of their face. (*Id.* ¶ 24.) Plaintiffs allege that Onfido's software "extract[s] and compare[s] numerical biometric data" to ensure that the faces depicted in the two images are the same. (*Id.* ¶ 26.) They further allege that Onfido stores this information in a database called "Known Faces," against which it compares any uploaded image. (*Id.* ¶ 29.)

But because Onfido's software is designed to be integrated into an existing app, Plaintiffs claim that consumers never know that Onfido has extracted or stored their biometric data; indeed, consumers are not made aware either that Onfido is involved, or that the identification process involves the extraction of biometric identifiers, Plaintiffs allege. (*Id.* ¶¶ 23, 28.) As such, Plaintiffs allege that Onfido fails to obtain any consent to its collection and storage of consumers' biometric identifiers, (*Id.* ¶ 31), and failed to establish and comply with a publicly-available policy which discloses when and how any retained biometric identifiers will be destroyed, (*Id.* ¶ 32).

Both named Plaintiffs used smartphone apps that incorporated Onfido's identity-verification software. (*Id.* ¶¶ 37, 44.) As such, both plaintiffs unknowingly uploaded images of their face to Onfido for identity-verification reasons, along with an image of a government-issued ID. (*Id.*) Plaintiff Fredy Sosa verified his identity in order to use an online consumer-to-consumer marketplace. (*Id.* ¶ 37.) Plaintiff Rohith Amruthur verified his identity in order to use a financial services app. (*Id.* ¶ 44.) Once Plaintiffs had uploaded images of their face, Onfido extracted biometric identifiers from these images in order to identify the Plaintiffs. (*Id.* ¶¶ 37, 44.) Neither Plaintiff provided Onfido with consent to extract or store their biometric identifiers. (*Id.* ¶¶ 40, 47.) And neither Plaintiff was provided with any kind of policy governing Onfido's retention and destruction of the biometric identifiers it has collected. (*Id.* ¶¶ 39, 45.) Plaintiffs contend that Onfido's failures in these regards violate the BIPA, 740 ILCS 14/15(a), (b).

### C.  Litigation, Negotiation, and Settlement

This case began in the Circuit Court of Cook County, when Fredy Sosa sued Onfido for violating sections 15(a) and (b) of the BIPA. Onfido promptly removed the case to this Court (dkt. 1), and moved to compel arbitration of Sosa's claim (dkt. 20). Onfido's theory was that the

terms of service of the specific app used by Sosa, OfferUp, an online marketplace like Craigslist, included an arbitration clause, and that Onfido was entitled to take advantage of that clause because Sosa's claim concerned the use of the OfferUp app. (Dkt. 21.) This Court rejected that theory (dkt. 31), and Onfido took an immediate appeal to the Seventh Circuit. After full briefing and oral argument, the Court of Appeals affirmed this Court's decision in a written opinion, holding that Illinois law did not permit Onfido, a nonsignatory who was not mentioned in the terms of service, to invoke the arbitration clause governing the relationship of Sosa and OfferUp. *Sosa v. Onfido Inc.*, 8 F.4th 631 (7th Cir. 2021).

On remand, Onfido moved to dismiss the complaint for failure to state a claim. (Dkt. 45.) Onfido specifically contended that the BIPA's exemption for "information derived from" photographs immunized its conduct from liability under the BIPA, that the reasonableness of its conduct precluded an award of statutory damages, and that application of the BIPA to Onfido's product would violate the First Amendment. (Dkt. 46.) After the motion was fully briefed, this Court *sua sponte* ordered the Parties to address whether Sosa has Article III standing to assert his claim under § 15(a) of the BIPA. Shortly thereafter, the Court denied Onfido's motion to dismiss in full, after concluding that it had subject-matter jurisdiction over all portions of Sosa's lawsuit. (Dkt. 58.) Onfido thereafter answered the complaint, raising 21 affirmative defenses. (Dkt. 59.)

The Parties then began to conduct discovery. The Parties exchanged initial disclosures on July 7, 2022, and Plaintiff Sosa served his first set of interrogatories and requests for production to Onfido on August 17, 2022. Sosa's early efforts were aimed at determining the size of the putative class, as that information is necessary for informed and fruitful settlement discussions. Through these initial conversations and the exchange of informal discovery, two facts of particular salience surfaced: (1) Onfido is not in a position at this time to fund a settlement on par

7

with other settlements in the BIPA space; and (2) Onfido has a variety of different clients in this space, some of whom might themselves be able to claim exemptions from BIPA liability, such as financial institutions. Onfido also signaled its willingness to discuss an amicable resolution of the case.

Sosa and his counsel quickly realized that an adequate resolution of the case would require two classes, and therefore an additional representative. Fortunately, an additional class member, Rohith Amruthur, stepped forward and indicated his willingness to represent those class members whose circumstances differed materially from Sosa's on account of the type of Onfido client they interacted with when using Onfido's identity-verification services.

As the Parties began to prepare for a lengthy discovery period, they also engaged in settlement discussions. As part of these discussions, Plaintiffs' counsel reviewed Onfido's financial statements over the past four years, and factored those financial limitations into the settlement negotiations. (Declaration of Schuyler Ufkes ("Ufkes Decl."), attached hereto as Exhibit 2, ¶ 4.) Over the course of five months, during which further informal discovery was exchanged, the Parties hammered out the principal terms of a settlement agreement. (*Id.*) But even after a memorandum of understanding had been signed on December 3, 2022, significant work remained to hammer out the remaining details. (*Id.*) Over the course of the following three months, the Parties went back and forth before ultimately agreeing to the Settlement Agreement that is presently before the Court. (*Id.*)

## III. SETTLEMENT TERMS

The full Settlement Agreement is attached as Exhibit 1. For the Court's convenience the principal terms of the Settlement are summarized below.

### A.    Class Definitions

For reasons explained below, the instant Settlement proposes to create two separate classes. They are defined as:

- **Financial Institution Class**: All persons who, while within the State of Illinois, uploaded their photograph(s) and an ID to any application, software, or website operated by a Financial Institution Customer, and subsequently to Onfido, between June 12, 2015 and the date of the Preliminary Approval Order. A "Financial Institution Customer" is an Onfido client that is "engaged in (a) lending, exchanging, transferring, investing for others, or safeguarding money or securities; (b) providing insurance; (c) providing financial, investment, or economic advisory services; or (d) underwriting, dealing in, or making a market in securities." (Agreement §§ 1.16, 1.17.)

- **Non-Financial Institution Class**: All persons who, while within the State of Illinois, uploaded their photograph(s) and an ID to any application, software, or website operated by a Non-Financial Institution Customer, and subsequently to Onfido, between June 12, 2015 and the date of the Preliminary Approval Order. A "Non-Financial Institution Customer" is any Onfido client who is not a financial institution potentially exempted from liability under the BIPA. (*Id.* §§ 1.22, 1.23.)

Excluded from each definition are (1) persons who executed a written release or consent form specifically naming Onfido as being authorized to collect or store their alleged biometric data, before their alleged biometric data was ever collected or stored by Onfido, (2) any Judge or Magistrate presiding over this action and members of their families, (3) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, (4) persons who properly execute and file a timely request

for exclusion from the Settlement Classes, and (5) the legal representatives, successors or assigns of any such excluded persons. (*Id.* §§ 1.17, 1.23.)

**B.     Settlement Payments**

Along with the creation of separate classes, the instant Settlement also proposes to create two different settlement funds, one corresponding to each of the Settlement Classes. Each member of each class who timely submits a valid claim will be entitled to a *pro rata* share of the respective settlement fund, issued either electronically or as a check, at the class member's election. However, as explained above and below, the Settlement here is being funded on a rolling basis, to account for the Defendant's inability to fully fund the Settlement all at once. Settlement payments shall also be on a rolling basis. Those who elect to receive electronic payments shall receive their *pro rata* share of their relevant settlement fund in four installments over three years. (Agreement § 2.1(c), Exhibit A.) Those who elect to receive their payment by paper check shall receive their payment in two installments over three years (to limit administrative expenses, as paper checks are more costly to print and mail). (*Id.* § 2.1(d), Exhibit A.) Anyone who is a member of both classes will receive their payment entirely from the fund created for the claims of the Non-Financial Institution Class. (*Id.* § 2.2.)

**C.     Prospective Relief**

Onfido has agreed to create, post on its website, and abide by, a public policy governing the retention and deletion of biometric data. (*Id.* § 2.4.) Defendant further agrees to establish a consent form, including as part of its current software development kit (SDK), which provides notice of Onfido's collection of biometric data and seeks informed and written consent. (*Id.*) Defendant has agreed to distribute the consent form to its customers and instruct them to use the latest releases of Onfido's SDK, which implement the consent form, or otherwise instruct that

10

equivalent language is viewed and agreed to by users who reside in Illinois before Onfido performs any identity verification on those users. (*Id.*) Finally, Defendant has agreed to require customers that have users who reside in Illinois to confirm annually, for the next two years, that they are either using the informed written consent forms provided by Onfido or are otherwise complying with BIPA. (*Id.*)

### D. Payment of Settlement Notice and Administrative Costs

The Settlement seeks appointment of Simpluris, Inc, as Settlement Administrator who will be responsible for Notice to the Settlement Classes and administration of both settlement funds. The administrator will be responsible for disseminating direct Notice in paper and electronic forms, disseminating reminder Notice in electronic form, placing targeted ads to supplement the direct Notice, operating the Settlement Website, and processing submitted claims. The Settlement Administrator's payment shall come from each fund in proportion.

### E. Payment of Attorney's Fees, Costs, and Incentive Awards

Proposed Class Counsel will move the Court for an award of fees and costs. With no consideration from Defendant, proposed Class Counsel has agreed to limit its request for fees and costs to 33% of each fund remaining after payment of Settlement Administration Expenses and service awards. Defendant retains the right to oppose any fee request. In light of their service to the Settlement Classes, each class representative will move for an incentive award of $5,000, subject to Court approval, to be paid from each respective settlement fund. Plaintiffs will move for these payments via a separate request after preliminary approval and prior to the deadline to object to the Settlement. Any award of attorneys' fees will be paid to Class Counsel on a rolling basis over three years, on the same staged schedule as the payments to the Settlement Classes.

### F. Release of Liability

In exchange for the above, Onfido will receive under the Settlement a release of all claims arising from or relating to alleged biometric data derived from images submitted to Onfido. (Agreement §§ 1.32-1.34, 3.1.) Importantly, however, this release will not extend to any of Onfido's customers. (*Id.* § 1.33.) Thus, where appropriate, FI Class Members and NFI Class Members may still pursue BIPA claims against these entities.

## IV. THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED SETTLEMENT AND DIRECT NOTICE TO THE PROPOSED SETTLEMENT CLASSES

Approval of a class action settlement proceeds in three stages. First, the parties present a proposed settlement to the court for preliminary approval. Second, if the court preliminarily approves the settlement, notice of the proposed settlement is sent to the class, and class members are given an opportunity to object or opt out of the settlement. Third, after holding a final fairness hearing, the court decides whether to give final approval to the settlement. *See* Fed. R. Civ. P. 23(e); 4 NEWBERG ON CLASS ACTIONS § 13:1 (6th ed.). At this first stage, preliminary approval, the parties must show "that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Here, both elements are satisfied.

### A. The Settlement Classes Can Be Certified

Taking the second prong first, this Court will be able to certify the Settlement Classes for purposes of Settlement and entering the final judgment. BIPA cases in general are prime candidates for class certification, given that such claims typically involve straightforward, discrete legal and factual issues concerning a practice applied to a well-defined population. *See Rogers v. BNSF Ry. Co.*, 19 C 3038, 2022 WL 854348 (N.D. Ill. Mar. 22, 2022) (Kennelly, J.)

(certifying adversarial BIPA class); *Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019) (upholding adversarial BIPA class certification), *cert. denied Facebook, Inc. v. Patel*, 140 S. Ct. 937 (2020). And numerous other BIPA classes have been certified for settlement purposes. This case likewise presents a straightforward case for class certification.

To merit certification, both Settlement Classes must satisfy the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460 (2013). Additionally, where, as here, certification is sought pursuant to Rule 23(b)(3), it must be shown that (i) common questions of law or fact predominate over individual issues and (ii) a class action is the superior device to resolve the claims. *Id*. Finally, Rule 23 contains an implicit "ascertainability" requirement "that classes be defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). As explained below, the proposed Settlement Classes satisfy all the Rule 23(a) and (b)(3) prerequisites as well as Rule 23's implicit ascertainability requirement.

### 1.    Both classes are too numerous to permit individual joinder.

First, any class must be so large that joinder of individual class members is impracticable. Fed. R. Civ. P. 23(a)(1). "While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017). Here, Defendant has represented, and informal discovery has confirmed, that each proposed settlement class easily meets this threshold. The Financial Institution Class, for instance, contains approximately 457,857 members, and the Non-Financial Institution Class contains approximately 194,954 members. (Ufkes Decl. ¶ 3.) Each of the Settlement Classes is far too large to permit individual joinder, so Rule 23(a)(1) is satisfied.

**2.      Common questions predominate over any individual questions within the claims of both proposed Settlement Classes.**

Rule 23(a) next requires that the claims of a certified class present at least one common question of law or fact. Fed. R. Civ. P. 23(a)(2); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("Even a single common question will do.") (cleaned up). For commonality, "[t]he critical point is the need for *conduct* common to members of the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (internal quotations omitted). This prerequisite often overlaps with Rule 23(b)(3)'s predominance criterion, which requires that common questions predominate over any individual questions present in the action. *See Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 443 (7th Cir. 2015). "The guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1029 (7th Cir. 2018). Here, there are numerous common questions, demonstrating that both proposed Settlement Classes satisfy both the commonality and predominance criteria.

**i.      Questions common to both classes.**

There is significant overlap in the claims of the two proposed classes, and therefore also significant overlap in the common questions presented by the claims of each class. For instance, both proposed Settlement Classes challenge the use of the same Onfido technology, which, based on counsel's investigation, operated materially identically during the entirety of the class period. Based on counsel's investigation, this technology also operates in the same way across applications: after a photo of the user's ID is uploaded and analyzed, an image of a face is uploaded and analyzed, and identifying features are extracted from both photos and compared for a match. Thus, every member of each class would need to litigate whether the information extracted by Onfido qualifies as a "scan of face geometry," 740 ILCS 14/10, whether Onfido has

14

collected, captured, purchased, received through trade, or otherwise obtained the biometric identifiers of any members of the classes, 740 ILCS 14/15(b), and if so, whether Onfido has obtained informed and written consent to this collection, 740 ILCS 14/15(b)(1)-(3) (setting forth requirements for informed consent). *See Rogers*, 2022 WL 854348, at *2 (observing that "standardized" use of biometric technology gave rise to common questions).

Moreover, even at this preliminary stage, Onfido has raised two issues beyond the elements of a BIPA claim that are common to every member of the two proposed Settlement Classes. First, BIPA authorizes differing awards of liquidated damages for "negligent" or "intentional or reckless" violations of the statute. 740 ILCS 14/20. Onfido contends that its conduct was at all times reasonable. (*See* Dkt. 46 at 9; Dkt. 59 at 21-22.) And in its motion to dismiss, Onfido sought to "dismiss" Sosa's ability to recover damages at the $5,000 level. (Dkt. 46 at 7-8.) These contentions raise a common legal issue: does reasonable conduct that is nevertheless in violation of the statute preclude an award of liquidated, statutory damages? The Court rejected Onfido's argument as premature at the motion to dismiss stage, but left it open for resolution if and when liability is established. (Dkt. 58 at 18-20.) Resolution of that argument would resolve a significant legal question for every member of both proposed Settlement Classes.

Second, in its Answer, Onfido raised the possibility that application of the BIPA to its conduct may violate Illinois's rule against extraterritoriality. (Dkt. 59 at 20.) Onfido's principal place of business is California (Dkt. 1-4 ¶ 3), and it appears that Onfido's servers are all outside of Illinois. On the other hand, all of the members of the Settlement Classes are united in that they are Illinois residents who uploaded an image of their ID and their face to Onfido servers located outside of Illinois. Whether those actions have a sufficient connection to Illinois to subject

15

Onfido to liability under an Illinois state law is a question that is common to both proposed classes. *Patel*, 932 F.3d at 1276 (holding that extraterritoriality presented a common question in similar circumstances).

> ii.     **The additional common question inherent in the claims of the Financial Institutions Class.**

All of the above questions are common across both Settlement Classes. However, the claims of the Financial Institution Class require the resolution of an additional common question, necessitating the proposed separate representation. The BIPA establishes that "nothing in this Act shall be deemed to apply in any manner to a financial institution or an affiliate of a financial institution that is subject to Title V of the federal Gramm-Leach-Bliley Act of 1999 and the rules promulgated thereunder." 740 ILCS 14/25(c). Onfido is not itself a financial institution, nor is it subject to the Gramm-Leach-Bliley Act ("GLBA") or any rules promulgated thereunder. But does it nevertheless acquire the protection of this exemption from liability when it collects biometric identifiers on behalf of a financial institution, considering that BIPA cannot apply "in any manner" to a financial institution? Or is Onfido, in those circumstances, an exempted *affiliate* of a financial institution? Members of the Financial Institution Class allegedly unknowingly surrendered their biometric identifiers to Onfido within the context of a relationship with a covered financial institution. So for the members of this class, success on the merits requires a common showing that Onfido does not fit within the BIPA's financial-institution exemption. This additional common question requires separate representation for this set of individuals.

By contrast with these myriad common questions, the record, including Onfido's filings and the informal discovery conducted thus far, reveals no individualized questions. For instance, much like Sosa himself, Onfido does not have a direct relationship with any member of either of

16

the proposed Settlement Classes. Therefore, Onfido has no unique arbitration defense to the claims of any member, or groups of members, of either of the proposed Settlement Classes. Nor does it appear that Onfido collected any different information for one or a group of its clients as opposed to others, such that the answer to the question of how to categorize the data collected by Onfido will not apply class-wide.

In sum, given the wealth of common questions and the dearth of individualized questions, the proposed Settlement Classes here both satisfy Rule 23's commonality and predominance criteria.

### 3. Plaintiffs are typical of the classes they propose to represent.

Next up is typicality. Fed. R. Civ. P. 23(a)(2). The typicality requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983). Where a named plaintiff's claim "arise[s] from the same events or course of conduct that gives rise to the putative class members' claims," typicality is satisfied. *Beaton*, 907 F.3d at 1026. In other words, when the basis of the suit is the defendant's systematic business practices toward the named plaintiff and the members of the proposed class, typicality is generally satisfied.

Here, both named Plaintiffs were subject to Onfido's generalized conduct: both allege they uploaded images unknowingly to Onfido, both allege they had the same type of biometric identifiers extracted from those images, and neither named Plaintiff consented to this collection. But as described above, there is a critical difference between the two proposed Settlement Classes: Onfido may have a separate defense with respect to members of the proposed Financial Institution Class. Plaintiff Fredy Sosa, who initiated this action, did not upload his image to

Onfido through a financial institution—he did so through OfferUp. Therefore, he "ha[s] no interest" in resolving the question whether Onfido fits within BIPA's financial-institution exemption with respect to its financial-institution clients, and "lack[s] the ability" to litigate that question on behalf of those who would need to resolve it. *Conde v. Open Door Mktg. LLC*, 223 F. Supp. 3d 949, 960 (N.D. Cal. 2017). However, because Plaintiff Rohith Amruthur *did* interact with Onfido through a financial services app, he is typical of that group of people. *See De La Fuente*, 713 F.2d at 232 ("A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. … Thus, similarity of legal theory may control even in the face of differences of fact.") (quotations omitted). And Sosa remains typical of those who, like him, uploaded an image of their face to Onfido through an app for a type of business *other* than financial institutions.

With that wrinkle sorted, because the claims of the named Plaintiffs will "stand or fall on the same facts" as the claims of the proposed class each moves to represent, typicality is satisfied. *Ziemack v. Centel Corp.*, 163 F.R.D. 530, 534 (N.D. Ill. 1995).

### 4. Plaintiffs and their lawyers are adequate to represent the proposed Settlement Classes.

Last up under Rule 23(a) is adequacy. This prerequisite requires a finding that the class representative has and will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is twofold: "adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest[s] of the class members." *Starr v. Chi. Cut Steakhouse*, 75 F. Supp. 3d 859, 874 (N.D. Ill. 2014) (quoting *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584 (7th Cir. 1993)). To assess adequacy, courts examine whether "the named plaintiff has [(1)] antagonistic or conflicting

18

claims with other members of the class; or (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) has counsel that is competent, qualified, experienced and able to vigorously conduct the litigation." *Osada v. Experian Info. Sols., Inc.*, 290 F.R.D. 485, 490 (N.D. Ill. 2012) (quoting *Quiroz v. Revenue Prod. Mgmt., Inc.*, 252 F.R.D. 438, 442 (N.D. Ill. 2008)).

Here, both Plaintiffs and proposed Class Counsel have and will continue to adequately represent the Settlement Classes. Because Plaintiffs suffered the same alleged injury as every other member of the Settlement Classes—the collection and storage of their biometric data without their informed written consent—their interest in redressing Onfido's alleged violations of BIPA is identical to the interests of all other members of the Settlement Classes.

For similar reasons, the named Plaintiffs' lawyers are more than adequate to represent the Settlement Classes, *see* Fed. R. Civ. P. 23(a)(4), and the Court should appoint them under Rule 23(g).[3] Proposed Class Counsel Edelson PC have extensive experience in litigating class actions of similar size, scope, and complexity to the instant action. Edelson PC is a national leader in high stakes plaintiffs' work ranging from class and mass actions to public client investigations and prosecutions. (*See* Firm Resume of Edelson PC, attached as Exhibit 2-A to Ufkes Decl.) The firm filed the first-ever class action under BIPA against Facebook, *Licata v. Facebook, Inc.*, No. 2015-CH-05427 (Cir. Ct. Cook Cnty. Apr. 1, 2015), secured the first-ever adversarially certified

---

[3]     In determining whether to appoint counsel under Fed. R. Civ. P. 23(g), the Court considers proposed Class Counsel's: (1) work in identifying or investigating the potential claim, (2) experience in handling class actions, other complex litigation, and the types of claims asserted in the action, (3) knowledge of the applicable law, and (4) resources that it will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). These factors overlap substantially with the factors considered in determining counsel's adequacy to represent a class. *See Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592–93 (7th Cir. 2011), *as modified* (Sept. 22, 2011) (reviewing counsel's adequacy under Rule 23(a)(4) but mentioning the Rule 23(g) factors in its analysis). Plaintiffs discuss all of these considerations in one go above.

BIPA class in that case and defended the ruling in the Ninth Circuit, *Patel,* 932 F.3d at 1277 (upholding adversarial BIPA class certification), and obtained final approval of a settlement agreement with Facebook to resolve the case for $650 million—the largest BIPA settlement to date, *In re Facebook Biometric Info. Priv. Litig.*, No. 15-cv-3747-JD, 2021 WL 757025, at *1 (N.D. Cal. 2021) ("Overall, the settlement is a major win for consumers in the hotly contested area of digital privacy."). The firm is responsible for the first-ever BIPA settlement, too, *see Sekura v. L.A. Tan Enters., Inc.*, 2015-CH-16694 (Cir. Ct. Cook Cnty.), and has secured many favorable appellate decisions for BIPA plaintiffs (in addition to the appellate victory in this case). *Sekura v. Krishna Schaumburg Tan, Inc.,* 2018 IL App (1st) 180175 (pre-*Rosenbach*, holding violation of statute sufficient for plaintiff to be "aggrieved"); *Rottner v. Palm Beach Tan, Inc.*, 2019 IL App (1st) 180691-U (violation of statute sufficient to claim liquidated damages); *McDonald v. Symphony Bronzeville Park LLC*, 2022 IL 126511 (holding that the exclusivity provisions of the Illinois Workers' Compensation Act do not bar employee BIPA claims against employers).

The firm was recognized by Law360 in 2023 as a "Practice Group of the Year" for Cybersecurity and Privacy[4]—and was recognized for three years running as an "Illinois Powerhouse," alongside Kirkland & Ellis, Sidley Austin, Mayer Brown, Dentons, and Jenner & Block.[5] Edelson has been the only plaintiffs' firm, as well the only firm with fewer than 100

---

[4]    *Law360 Names Practice Groups of the Year*, LAW360 (Jan. 11, 2023), https://www.law360.com/articles/1562154; Parker Quinlan, *Cybersecurity & Privacy Group Of The Year: Edelson*, LAW360 (Feb. 21, 2023), https://www.law360.com/articles/1567512/cybersecurity-privacy-group-of-the-year-edelson.

[5]    Lauraann Wood, *Illinois Powerhouse: Edelson*, LAW360 (Sept. 3, 2019), https://www.law360.com/articles/1193728/illinois-powerhouse-edelson; Diana Novak Jones, *Illinois Powerhouse: Edelson PC*, LAW360 (Aug. 28, 2018), https://www.law360.com/articles/1076447/illinois-powerhouse-edelson-pc; Diana Novak Jones,

attorneys, to make the latter list. Proposed Class Counsel have diligently investigated, prosecuted, and dedicated substantial resources to the claims in this action and will continue to do so throughout its pendency. (Ufkes Decl. ¶ 2.)

Moreover, unitary representation of the two proposed Settlement Classes here comports with Due Process. As Professor William B. Rubenstein explains, "class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed. Indeed, courts have recognized that concurrent representation may enable counsel to leverage a better settlement for [all] sets of plaintiffs due to a defendant's desire to obtain a global resolution." 1 NEWBERG ON CLASS ACTIONS, § 3:75 (6th ed. 2022). Here, where each proposed class seeks the same type of relief and there is not a limited fund (as in, for instance, an ERISA action), the two class's interests are not opposed. And, as explained in more detail below, competing sets of lawyers likely would have been detrimental to the claims of all members of any of the Settlement Classes because overlapping litigation (and even overlapping settlement negotiations) likely would have substantially depleted the resources of Onfido. And of course because the Court retains the obligation to ensure that the Settlement is fair to all members of both Settlement Classes, the Court's review of the Settlement will ensure that no disabling conflicts of interest have arisen by virtue of this global resolution of this case.

The adequacy requirement is satisfied.

---

*Illinois Powerhouse: Edelson PC*, LAW360 (October 5, 2017), https://edelson.com/wp-content/uploads/2016/05/Illinois-Powerhouse-Edelson-PC.pdf.

### 5. A class action is the superior way to resolve this controversy.

A money-damages class like the present two must also satisfy Rule 23(b)(3). *See Wal-Mart*, 564 U.S. at 359. One part of the Rule 23(b)(3) inquiry is predominance, which is discussed above. Rule 23(b)(3) also requires that a class action is a superior means of resolving the controversy, considering class members' interests in individually controlling the prosecution of their claims, other litigation pending by or against class members, and the desirability of concentrating the litigation in the particular forum. A fourth consideration, whether any class trial would be manageable, is irrelevant here. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (noting that "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems…for the proposal is that there be no trial" but that the remaining prerequisites demand "undiluted, even heightened, attention").

When a large, relatively diffuse class is allegedly entitled to a small sum of money on account of the uniform, widespread actions of a particular defendant, a class action is often the superior method of adjudicating the particular controversy. *See Wahl v. Midland Credit Mgmt., Inc.*, 243 F.R.D. 291, 301 (N.D. Ill. 2007) (finding superiority satisfied where the defendant "engaged in standardized conduct … that affected many consumers" but individual claims "would likely be too small to vindicate through an individual suit"). And that is true here as well.

First, given the relatively small damages awards available, individual class members have little interest in controlling the prosecution of their individuals claims. *See* 2 NEWBERG ON CLASS ACTIONS § 4:69 (6th ed. 2022) ("representative litigation is superior" when class members' claims "may be so small that it would be a waste of their time and/or resources to litigate individually"). Unsurprisingly, there are no other cases pending against Onfido, which is

powerful evidence that individual class members lack a sufficient incentive to go it alone. *See id*

§ 4:70.

Finally, it is desirable to concentrate the litigation here. Given the enormous size of the

two proposed Settlement Classes, even if just 5 or 10 percent of the classes were to try their

cases individually, there would be a flood of litigation that would clog the courts. And, finally,

"consolidating these claims in this forum is particularly appropriate given BIPA is an Illinois

statute, and the alleged violations all occurred within Illinois." *Rogers*, 2022 WL 854348, at *4.

### 6. The Settlement Classes are ascertainable.

Finally, in addition to satisfying the explicit requirements of Rule 23(a) and (b)(3), the

proposed class satisfies Rule 23's implicit ascertainability requirement, which requires that a

class "be defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. "Under the

'weak' version of ascertainability employed by the Seventh Circuit, courts worry most about 'the

adequacy of the class definition itself,' not 'whether, given an adequate class definition, it would

be difficult to identify particular members of the class.'" *T.K. through Leshore v. Bytedance*

*Tech. Co., Ltd.*, No. 19-cv-7915, 2022 WL 888943, at *2 (N.D. Ill. Mar. 25, 2022) (quoting

*Mullins*, 795 F.3d at 659).

Here, both classes are not only defined based on objective criteria defining a time frame

and category of Onfido customer through which photographs were uploaded in Illinois, but the

members of each class can be separately identified through Onfido's customers' records, and the

parties have already made significant progress in obtaining those records for purposes of direct

notice and claim form validation. (Agreement Recitals H & I; § 4.1.) Plaintiffs will subpoena any

Onfido customer who refuses to voluntarily provide their users' names and contact information

who fall within the Settlement Classes. (*Id.* § 4.1(b).) Therefore, each of the Settlement Classes meet this Circuit's ascertainability requirement.

In sum, the Court should certify the proposed Settlement Classes for settlement purposes, appoint Edelson PC as counsel to both Settlement Classes, appoint Fredy Sosa to represent the Non-Financial Institution Class, and appoint Rohith Amruthur to represent the Financial Institution Class.

### B. The Court Should Preliminarily Approve the Proposed Settlement

In addition to showing that the Settlement Classes are certifiable, the parties must also show that the Court "will likely be able to … approve the [settlement] proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). Rule 23(e)(2) requires the Court to find that the settlement is "fair, reasonable, and adequate" after considering whether: (A) the class representative and class counsel have adequately represented the class; (B) the settlement was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the settlement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2). The proposed Settlement in this case easily satisfies these requirements.

### 1. The Classes have been adequately represented.

The first Rule 23(e)(2) factor asks whether the class has been adequately represented. Fed. R. Civ. P. 23(e)(2)(A). The focus of this analysis is "on the actual performance of counsel acting on behalf of the class" throughout the litigation and in settlement negotiations. Fed. R. Civ. P. 23(e), Advisory Committee's Note to 2018 Amendment; *see Gumm v. Ford*, No. 5:15-cv-41-MTT, 2019 WL 479506 at *3 (M.D. Ga. Jan. 17, 2019). In considering this factor, courts are to examine whether plaintiff and class counsel had adequate information to negotiate a class-wide settlement, taking into account (i) the nature and amount of discovery completed, whether

formally or informally, and (ii) the "actual outcomes" of other, similar cases. Fed. R. Civ. P. 23(e), Advisory Committee's Note to 2018 Amendment. Ultimately, this factor is generally satisfied where the named plaintiff participated in the case diligently, and where class counsel fought hard on behalf of plaintiff and the class throughout the litigation. *See Snyder v. Ocwen Loan Servicing, LLC*, No. 14 c 8461, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019).

There can be little doubt that the proposed Settlement Classes have been adequately represented here. Plaintiff Sosa and proposed Class Counsel successfully defeated a motion to compel arbitration, and then successfully defended that victory in front of the Court of Appeals, resulting in a published decision. Upon return of the case to this Court, they then defeated Onfido's Rule 12(b)(6) motion to dismiss. And both Plaintiffs stood ready to participate in extensive discovery here, including responding to interrogatories and sitting for depositions. Moreover, Class Counsel has conducted an extensive investigation into Onfido, and has extensive experience litigating and settling class actions under the BIPA. They were fully informed and able to assess the strengths and weaknesses of any proposed settlement.

The results achieved follow from this diligence and preparation. Although the claims here involve several dispositive factual questions without clear answers in the case law, and although the combined size of the Settlement Classes is in the hundreds of thousands, the Settlement before the Court returns real cash to Illinois consumers, despite the Defendant's financial condition. Especially in cases involving larger classes, privacy class-action settlements often fail to generate real monetary benefits for the class. This Settlement bucks that trend, thoroughly demonstrating that the proposed Settlement Classes were adequately represented.

## 2. The Settlement was the product of arm's-length negotiation.

The second Rule 23(e)(2) factor asks whether the settlement is the result of arm's-length negotiations. The course of litigation and negotiation here, as well as the structure of the Settlement, makes clear that this agreement is the product of arm's-length negotiating.

First, the fact that this Settlement was negotiated over a course of nearly seven months is indicative of arm's-length negotiating. (*See* Ufkes Decl. ¶ 4.) *See Bynum v. Cmty. Loans of Am., Inc.*, 20-CV-1564-PP, 2022 WL 10073493, at *2 (E.D. Wis. Oct. 17, 2022) (the fact that the settlement was negotiated "over a period of numerous months" is evidence of arm's-length negotiations) (quotations omitted). Moreover, the instant agreement was reached only after two attempts at dismissal and an unsuccessful appeal to the Court of Appeals. Finally, the Settlement itself makes clear that there was no collusion. Unclaimed funds will not revert to the defendant, and the provisions for attorney's fees do not contain a "clear sailing" or "kicker" clause. *See Snyder*, 2019 WL 2103379, at *4 (approving settlement where "there is no provision for reversion of unclaimed amounts, no clear sailing clause regarding attorneys' fees, and none of the other types of settlement terms that sometimes suggest something other than an arm's-length negotiation"). Most importantly, the outstanding relief secured by the Settlement, as well as the limited release of claims—i.e., Onfido's customers are not released—undermines any notion that negotiations here were anything other than arm's-length. *See Schulte v. Fifth Third Bank*, No. 09-CV-6655, 2010 WL 8816289, at *4 n.5 (N.D. Ill. 2010) (noting that courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered") (quotations omitted).

## 3. The Settlement secures outstanding relief in the face of serious risks should this case proceed to trial.

The third, and arguably most important, Rule 23(e)(2) factor asks whether the relief

provided by the settlement is adequate in light of the "costs" and "risks" of proceeding with the litigation on an adversarial basis, the "proposed method of distributing relief to the class," and "the terms of any proposed award of attorney's fees, including timing of payment." *See Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) ("The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.") (quotations omitted).

### i. The Settlement Classes face substantial obstacles to recovery.

Start with the relief balanced against the risks of further litigation. Here, the Settlement Classes faced significant risks above and beyond the risk inherent in any trial or appeal, and the Settlement secures immediate relief rather than forcing the Settlement Classes to endure years of costly and contentious litigation. *See Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *4 (N.D. Ill. Oct. 10, 1995) ("As courts recognize, a dollar obtained in settlement today is worth more than a dollar obtained after a trial and appeals years later.").

Many of Onfido's core legal and factual contentions have not been vetted at summary judgment or trial in any case. For instance, in *In re Facebook Biometric Information Privacy Litigation*, the parties hotly disputed whether Facebook collected "scan[s] of face geometry," a dispute that included competing characterizations about how Facebook's software processed human faces. *See* 2018 WL 2197546, at *2-*3 (N.D. Cal. May 14, 2018). The court's description of the parties' dispute highlights the risks the Settlement Classes would face here: Proving that Onfido collects "scans of face geometry" would involve intensive fact and expert discovery, which would almost certainly then need to be presented to a jury. Such a process would be costly

27

and time-consuming, and even then might not yield any positive results for the Settlement Classes.

Onfido's argument that the reasonableness of its conduct precludes any recovery also poses issues for the Settlement Classes. Only one court has addressed this issue head on, and there concluded that the reasonableness of the defendant's conduct was relevant only to whether a plaintiff was entitled to $1,000 or $5,000 upon proof of the defendant's liability. *Id.* at \*5. But Onfido would possess strong arguments that traditional Illinois tort principles support its position.

The potentially time-consuming nature of the necessary discovery process here is likely to cause other issues for the Settlement Classes. For instance, the record provides no reason to believe that Onfido has any servers or data-processing centers in the State of Illinois. Illinois requires that any statutory violation occur "primarily and substantially" within the borders of Illinois for liability under an Illinois state statute to accrue. *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005). Courts have held that when a plaintiff uploads an image from Illinois that the defendant extracts biometric identifiers from, there is at least a question of fact for the jury whether the defendant's collection occurs "primarily and substantially" in Illinois. *Patel*, 932 F.3d at 1276. But extraterritoriality remains an obstacle to surmount, at least where the plaintiff's data is being uploaded to a first collector and passed on to a vendor, such as in the circumstances of this case, in which Onfido is a service-provider to the company with whom the class members are interacting. *See Vance v. Amazon.com, Inc.*, No. C20-1084JLR, 2022 WL 12306231, at \*6-8 (W.D. Wash. Oct. 17, 2022); *McGoveran v. Amazon Web Servs., Inc.*, No. CV 20-1399-LPS, 2021 WL 4502089, at \*4 (D. Del. Sept. 30, 2021). Thus, during a

drawn-out discovery period and complicated trial preparations, the legal ground under the Settlement Classes' claims may further erode.

After the Parties had agreed to the material terms of the Settlement and executed a binding Memorandum of Understanding, the Illinois Supreme Court decided *Cothron v. White Castle System, Inc.*, 2023 IL 128004. The decision cuts both ways: it was decidedly plaintiff-friendly in cementing that BIPA claims accrue for limitations purposes after each scan or transmission of biometric data (not after only the first) and determining that every scan and transmission violates the Act. *Id.* ¶ 40. But the Court also introduced the possibility that a trial court could adjust damages in its discretion. *Id.* ¶ 42. Thus, Plaintiffs continued to incur risks of continued litigation, even if they had won on class certification and on liability at trial. In light of the continued risk of litigation, the Settlement is exceptional.

As mentioned above, for Plaintiff Amruthur and the Financial Institution Class, specifically, they faced an additional litigation risk: that Onfido would escape liability under BIPA's "financial institution" exemption, 740 ILCS 14/25(c). While software vendors like Onfido have lost this argument at the pleading stage, Judge Wood recently suggested in *Davis v. Jumio Corp.*, that discovery is needed to determine whether requiring a software vendor to comply with BIPA by integrating notices and consents into a financial services app "would necessitate changes to how [the financial app] does business, such that BIPA might be considered as applying "in any manner" to [the financial app]." No. 22-CV-00776, 2023 WL 2019048, at *5 (N.D. Ill. Feb. 14, 2023). This risk specific to the Financial Institution Class was considered throughout settlement negotiations and is why the settlement fund for the Non-Financial Institution Class provides more monetary relief per class member than the settlement fund for the Financial Institution Class, as further explained below.

And of course, the prospect of adversarial class certification and trial present serious risks on their own. *See* Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 Amendment (instructing courts to consider the likelihood of certifying the class for litigation in evaluating this sub-factor); *see also Hudson v. Libre Tech., Inc*., No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060, at *6 (S.D. Cal. May 13, 2020) ("Proceeding in this litigation in the absence of settlement poses various risks such as failing to certify a class.").

Finally, the Settlement Classes face serious potential risk trying to collect on a judgment. Onfido has represented, and proposed Class Counsel have confirmed, that at present Onfido lacks the resources to fund a judgment in the case. The instant agreement accounts for this by constructing an extended payment plan, permitting Onfido to satisfy its obligations over a three-year period. This type of resolution is likely impossible on an adversarial judgment. First, were this case litigated to judgment, Onfido's limited resources would be further depleted, to the detriment of the Settlement Classes. And any adversarial judgment would simply plunge Onfido into bankruptcy, which in all likelihood would further erode (if not eliminate) the ability of any member of the proposed Settlement Classes to obtain any relief on their claims against Onfido.

### ii. The Settlement secures outstanding relief despite these risks.

Balanced against these substantial risks, the relief provided here is outstanding. Class members who submit a claim form will receive a *pro rata* distribution from the appropriate settlement fund (either the "FI Class Settlement Fund" or the "NFI Class Settlement Fund"). Generously assuming a 15 to 25% claims rate, and even after accounting for deductions for Settlement Administration Expenses and attorneys' fees and costs, Financial Institution Class Members will receive between roughly $65 and $110 and Non-Financial Institution Class Members will receive between $210 to $350.

This level of recovery compares favorably to other large BIPA settlements, and to other large privacy settlements in general. Indeed, it is frequently the case that privacy settlements featuring classes of this size settle for pennies per class member, or for settlements that are focused on injunctive relief. *See*, *e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 820–22 (9th Cir. 2012) (resolving tens of millions of claims under the Electronic Communications Privacy Act ("ECPA") for a $9.5 million *cy pres*-only settlement—amounting to pennies per class member— where $10,000 in statutory damages were available per claim); *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *3–5 (N.D. Cal. June 2, 2011) (resolving tens of millions of claims, again under the ECPA, for $8.5 million *cy pres*-only settlement). Some BIPA settlements, too, have depressed the amount defendants have to pay with credit monitoring, caps on the amount claiming class members can recover, and reversion of unclaimed funds. *E.g.*, *Carroll*, 2017-CH-01624 (credit monitoring only); *Marshall*, 2017-CH-14262 (paying a cap of $270 to individuals who filed claims and reverting the remainder to defendant). Even when comparing against other consumer BIPA settlements with class sizes in the hundreds of thousands of people, like this one, the per-person relief provided by this Settlement is as good or better than the rest. *See Prelipceanu*, 2018-CH-15883 ($7 million fund for approximately 260,000 class members); *Miracle-Pond*, 2019-CH-07050 ($6.75 million fund for potentially millions[6] of class members); *Kusinski*, 2017-CH-12364 ($25 million fund for approximately 320,000 class members); *Thome v. Novatime Tech., Inc.*, No. 19-cv-6256, dkt. 90 (N.D. Ill. Mar. 8, 2021) ($4.1 million fund for approximately 62,000 class members, and assignment of

---

[6]     The settlement papers submitted in *Miracle-Pond* represented that there were approximately 954,000 class members, but that number only counted Shutterfly *users* in Illinois; it did not include the vast number of *non-users* who appeared in users' photographs uploaded to Shutterfly and who were included in the settlement class definition.

insurance policy); *Rosenbach v. Six Flags Ent. Corp.*, 2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) (approving $36 million fund for approximately 1,110,000 class members, which caps class member payments at $200 or $60 depending on date of finger scan and provides that defendant retains all unclaimed funds). Using any metric, the relief secured by this non-reversionary Settlement is excellent, especially for a BIPA case of this magnitude.

Also notable is the limited nature of the release surrendered by FI Class Members and NFI Class Members under this Settlement. While the Settlement releases claims against Onfido, it preserves the ability of these Class Members to pursue any claims they may have against Onfido's clients.

<p align="center">iii. <b>The method of distributing recovery is fair.</b></p>

Next, the simple claims process here further confirms the adequacy of relief. As discussed in more detail below, the Class List will capture nearly everyone within the two proposed classes. Any individual on that list will need to submit a simple Claim Form verifying some basic information. (Agreement § 1.6) Additional individuals who believe they are members of either of the two proposed classes but who do not appear on the Class List will be asked for only as much additional information as is necessary to verify their claim. (*Id.* at Exhibit B) These claims forms will be accessible online, in addition to the paper copies that will be distributed to individuals on the Class List. And anyone who submits a valid claim electronically will be able to elect to receive their share of the relevant settlement fund electronically as well, such as through PayPal, Venmo, or Zelle.

      **iv.**      **The Settlement caps any award of attorneys' fees at a reasonable amount, and any amount awarded below that cap will be distributed to class members.**

Fed. R. Civ. P. 23(e) further asks the Court to assess the proposed relief in light of "the terms of any proposed award of attorney's fees, including timing of payment." Here, if the Settlement is preliminarily approved, proposed Class Counsel plan to petition the Court for an award of reasonable attorneys' fees after the Settlement Classes have received notice of the Settlement. The Settlement's contemplated method of calculating attorneys' fees (i.e., the percentage-of-the-fund method), and its limit on attorneys' fees (i.e., no more than 33% of each of the non-reversionary settlement funds) is reasonable and predicated on the outstanding relief provided to the Settlement Classes. The percentage-of-the-fund method has been used to determine a reasonable fee award in every BIPA class action settlement creating a common fund to date, and a 33% award will adequately capture the hypothetical *ex ante* agreement that the Settlement Classes would have entered into with proposed Class Counsel had they sought them out in the market, given the risks in the case. *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011); *e.g.*, *Figueroa*, No. 19-cv-01306, dkt. 380 (awarding 33% of fund); *Alvarado v. Int'l Laser Prods., Inc.*, No. 18-cv-7756, dkt. 70 (N.D. Ill. Jan. 24, 2020) (awarding 35% of fund); *Lopez-McNear v. Superior Health Linens, LLC*, No. 19-cv-2390, dkt. 69 (N.D. Ill. Apr. 27, 2021) (awarding 35% of fund); *Lark, et al v. McDonald's USA, LLC, et al.*, No. 17-L-559 (Cir. Ct. St. Clair Cnty. Feb. 28, 2022) (awarding 37% of fund); *Prelipceanu*, 2018-CH-15883 (awarding 40% of fund); *Zepeda v. Intercontinental Hotels Grp., Inc.*, 2018-CH-02140 (Cir. Ct. Cook Cnty.) (awarding 40% of fund). Accordingly, that the Settlement permits the Court to award 33% of the fund in attorneys' fees is appropriate.

Furthermore, there is no "kicker" clause here; any amount less than 33% awarded by the Court will remain available for distribution to class members with approved claims. And there is no "clear sailing" clause—Onfido may oppose any request for attorneys' fees. The Court's review of any petition for fees will ensure that Class Counsel do not receive an outsize share of the relief offered to the Settlement Classes. And Class Counsel will be paid along the same timeline that class members are.

### v. There are no side agreements separate from the Settlement Agreement.

The last consideration in Rule 23(e)(2)'s assessment of the adequacy of relief requires this Court to take into account "any agreement made in connection with the [proposed settlement]." Fed. R. Civ. P. 23(e)(2)(C)(iv), (3). This consideration ensures that the Court is aware of any "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2003 Amendment. Here, there are no such agreements; all terms and agreements affecting the members of the Settlement Classes are contained within the Settlement Agreement. (Ufkes Decl. ¶ 5.)

In sum, each of the four express considerations of Rule 23(e)(2)(C)'s adequacy of relief requirement suggest that this factor is satisfied here.

### 4. The Settlement treats members of all classes equitably.

The final Rule 23(e)(2) factor asks whether the settlement "treats class members equitably relative to each other." This Settlement plainly does.

In light of the different strengths of the FI Class's and NFI Class's claims, the FI Settlement Fund and NFI Settlement Fund are of different sizes. Given the approximate class sizes provided by Defendant, the FI Settlement Fund contains $26.87 per member, and the NFI

Settlement Fund contains $80.61 per member.[7] These different relative fund sizes reflect the differing strengths of the claims of these classes: While Onfido lacks many colorable defenses to the claims of the Non-Financial Institution Class, it has an additional, significant, untested defense to the claims of members of the Financial Institution Class. There is very little data on which to assess the strength of this defense (i.e., whether an entity that processes identification data for a "financial institution" is an exempted "affiliate" of said financial institution or is otherwise exempted by 740 ILCS 14/25(c)). Based on their extensive experience litigating BIPA class actions, Class Counsel believe the relative size of the two funds equitably accounts for the relative strengths and weaknesses of the claims of the different classes.

Likewise, the provision of a service award to Plaintiffs for serving as Class Representatives is consistent with the equitable treatment of class members. The requested $5,000 services awards are not only modest relative to the settlement funds that Plaintiffs have helped secure for the Settlement Classes, they also reflect the work Plaintiffs have done for the Settlement Classes, which was critical in ensuring the creation of a settlement that is fair for all. Moreover, an award of this size is squarely in line with, and in many instances lower than, other service awards given to class representatives in BIPA cases. *See Martinez v. Nandos Rest. Grp., Inc.*, No. 19-cv-07012, dkt. 63 (N.D. Ill. Oct. 27, 2020) ($7,500 service award) (Ellis, J.); *Dixon v. Washington & Jane Smith Cmty.-Beverly*, No. 17-cv-8033, dkt. 103 (N.D. Ill. May 31, 2018) ($10,000 service award) (Kennelly, J.). Given that Plaintiffs' efforts were key to securing the outstanding relief provided by the Settlement, the modest proposed service awards are fully

---

[7] The NFI Settlement Fund is three times larger per capita than the FI Settlement Fund ($26.87 x 3 = $80.61).

consistent with equity. Because the Settlement treats each member of the Settlement Classes equitably, this factor is well satisfied.

C. **The Court should approve the form and manner of Notice contemplated by the Settlement, and order that Notice be disseminated to the Settlement Classes.**

Finally, once the Court has preliminarily approved the Settlement, it must order that notice be disseminated to the Settlement Classes. Fed. R. Civ. P. 23(e)(1)(B). Rule 23 and Due Process require that for any "class proposed to be certified for purposes of settlement under Rule 23(b)(3)[,] the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974). Rule 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a [proposed settlement, voluntary dismissal, or compromise.]" Fed. R. Civ. P. 23(e)(1). Notice may be provided to the class via "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B). The substance of the notice to the class must describe in plain language the nature of the action, the definition of the class(es) to be certified, the class claims and defenses at issue, that class members may enter an appearance through counsel if so desired, that class members may request to be excluded from the class, and that the effect of a class judgment shall be binding on all class members. *See* Fed. R. Civ. P. 23(c)(2)(B).

Here, the Settlement contemplates a comprehensive Notice Plan that aims to provide direct notice to members of the Settlement Classes. To effectuate Notice, the Parties will first work together to create the Class List. (Agreement § 4.1(a).) Onfido has already reached out to its customers requesting that those companies voluntarily provide to the Settlement

36

Administrator the name and contact information of members of any of the proposed Settlement Classes. (*Id.*) Onfido represents that this will represent over 98% of all class members. (*Id.*) Should any Onfido customer refuse to comply with this request, Class Counsel will subpoena such Onfido customers for the necessary contact information. (*Id.* § 4.1(b).) Once all of this information is received and compiled, the Administrator will run the Class List against the National Change of Address Database, and update contact information as necessary. (*Id.* § 4.3(a).)

Direct Notice will be sent in both paper and electronic form to every individual on the Class List for whom an address and/or email address is available. (*Id.* § 4.3(b).) All of the Notice documents are written in plain, easily understood language. (*Id.* at Exhibits C-G.) To ensure a comprehensive Notice, the direct Notice efforts will be backstopped by at least two rounds of direct reminder notice and a digital media campaign targeted to users of the specific apps used by class members for whom no direct contact information is available. (*Id.* § 4.3(c), (e).)

All forms of notice will point to a Settlement Website (the URL of which will be included on the direct notice documents), which will provide class members 24/7 access to further information about the case, including important court documents and a detailed "long form" Notice document, and will allow class members to submit claim forms online. (*Id*. §§ 1.3, 1.4, 1.6, 1.38, 4.3(d), 5.1(e), Exhibits B, G.) Supporting the notices and Settlement Website will be a toll-free telephone line through which class members can contact Class Counsel and the Settlement Administrator to obtain additional information about the Settlement. (*Id.* § 5.1(e).)

Because the notice plan here proposes to reach at least 98% of the two Settlement Classes, it is fully consistent with Rule 23 and Due Process and should be approved.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order (1) preliminarily approving the proposed Settlement Agreement; (2) certifying the proposed Settlement Classes for settlement purposes with Plaintiffs Fredy Sosa and Rohith Amruthur serving as class representatives; (3) directing that notice be provided to persons the Settlement Classes pursuant to the notice plan set forth in the Settlement Agreement; (4) appointing J. Eli Wade-Scott and Schuyler Ufkes of Edelson PC as Class Counsel, (5) scheduling a final fairness hearing in this matter, and (6) providing such other and further relief as the Court deems reasonable and just.[8]

<div style="margin-left:40%">

Respectfully submitted,

**FREDY SOSA** and **ROHITH AMRUTHUR**,
individually and on behalf of all others similarly
situated,

</div>

Dated: March 13, 2023                    By: /s/ Schuyler Ufkes
                                              One of Plaintiffs' Attorneys

<div style="margin-left:40%">

J. Eli Wade-Scott
ewadescott@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

</div>

---

[8]     Plaintiffs will submit a proposed Preliminary Approval Order for the Court's convenience and to propose dates for the deadlines contemplated in the Settlement Agreement.