**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| FREDY SOSA and ROHITH AMRUTHUR, individually and on behalf of all others similarly situated, | Case No.: 20-cv-04247 |
| *Plaintiffs*, | Honorable Marvin E. Aspen |
| v. | |
| ONFIDO, INC., a Delaware corporation, | |
| *Defendant*. | |

**PLAINTIFFS' MOTION FOR AND MEMORANDUM OF LAW
<u>FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................... 1

II.    BACKGROUND ........................................................................................... 4

     A.    BIPA and the Underlying Claims ..................................................... 4

     B.    Litigation History and the Work Performed for the Settlement Class ........... 6

     C.    The Settlement Secures Excellent Relief for the Settlement Class ................. 10

III.   THE REQUESTED ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS ARE REASONABLE AND SHOULD BE APPROVED .......................... 12

     A.    Percentage-of-the-Fund Should Be Used to Determine Fees Here ................. 14

     B.    A 33% Fee Award of Each Fund Is Appropriate Here .................................. 16

         1.    This case presented serious obstacles to recovery, and Class Counsel litigated the case mindful of the high possibility that the class might recover nothing ....................................................................... 21

         2.    Class Counsel achieved an excellent result for the classes ................... 25

IV.   THE COURT SHOULD APPROVE THE REQUESTED INCENTIVE AWARDS ....................................................................................................... 28

V.     CONCLUSION ........................................................................................... 29

# **TABLE OF AUTHORITIES**

## **United States Supreme Court Cases**

*Frank v. Gaos*,
     139 S. Ct. 1041 (2019) ................................................................................................... 26

*Hall v. Cole*,
     412 U.S. 1 (1973) ............................................................................................................ 27

## **United States Appellate Court Cases**

*Americana Art China, Co., Inc. v. Foxfire Printing & Packaging Inc.*,
     743 F.3d 243 (7th Cir. 2014) .................................................................................. 13, 25

*Birchmeier v. Caribbean Cruise Line, Inc.*,
     896 F.3d 792 (7th Cir. 2018) ........................................................................................17

*Bryant v. Compass Group USA, Inc.*,
     958 F.3d 617 (7th Cir. 2020) ......................................................................................... 8

*Cook v. Niedert*,
     142 F.3d 1004 (7th Cir. 1998) ..................................................................................... 28

*Florin v. Nationsbank of Georgia, N.A.*,
     34 F.3d 560 (7th Cir. 1994) ......................................................................................... 14

*Fox v. Dakkota Integrated Systems, LLC*,
     980 F.3d 1146 (7th Cir. 2020) ....................................................................................... 8

*Golan v. FreeEats.com, Inc.*,
     930 F.3d 950 (8th Cir. 2019) ....................................................................................... 24

*Harman v. Lyphomed, Inc.*,
     945 F.2d 969 (7th Cir. 1991) ....................................................................................... 14

*In re Broiler Chicken Antitrust Litigation*,
     No. 22-2889, 2023 WL 5599636 (7th Cir. 2023) ........................................................ 20

*In re Google Referrer Header Priv. Litig.*,
     869 F.3d 737 (9th Cir. 2017) ....................................................................................... 26

*In re Stericycle Securities Litigation*,
     35 F.4th 555 (7th Cir. 2022) ................................................................................... 18, 19

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ................................................................................. *passim*

*In re Trans Union Corp. Privacy Litig.*,
    629 F.3d 741 (7th Cir. 2011) ........................................................................... 13

*Kirchoff v. Flynn*,
    786 F.2d 320 (7th Cir. 1986) ........................................................................... 15

*Montgomery v. Aetna Plywood*,
    231 F.3d 399 (7th Cir. 2000) ........................................................................... 16

*Patel v. Facebook, Inc.*,
    932 F.3d 1264 (9th Cir. 2019) ......................................................................... 23

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ........................................................................... 16

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ............................................................. 12, 13, 17

*Silverman v. Motorola Sols., Inc.*,
    739 F.3d 956 (7th Cir. 2013) ..................................................................... 12, 21

*Sosa v. Onfido Inc.*,
    8 F.4th 631 (7th Cir. 2021) ............................................................................... 7

*Sutton v. Bernard*,
    504 F.3d 688 (7th Cir. 2007) ........................................................................... 12

*Taubenfeld v. AON Corp.*,
    415 F.3d 597 (7th Cir. 2005) ........................................................................... 17

*United States v. Dish Network L.L.C.*,
    954 F.3d 970 (7th Cir. 2020) ........................................................................... 24

*Wakefield v. ViSalus, Inc.*,
    51 F.4th 1109 (9th Cir. 2022) ......................................................................... 24

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ........................................................................... 16

**United States District Court Cases**

*Adkins v. Facebook, Inc.*,
    No. 18-cv-05982-WHA (N.D. Cal. 2021) ........................................................ 26

iv

*Aranda v. Caribbean Cruise Line, Inc.*,
  No. 12 C 4069, 2017 WL 1369741 (N.D. Ill. Apr. 10, 2017) ....................................17, 19

*Bryant v. Compass Grp. USA, Inc.*,
  No. 19-cv-06622 (N.D. Ill. Sept. 8, 2022) ...................................................... 27

*Figueroa, et al. v. Kronos Inc.*,
  454 F. Supp. 3d 772 (N.D. Ill. 2020) .............................................................. 21

*Gehrich v. Chase Bank USA, N.A.*,
  316 F.R.D. 215 (N.D. Ill. 2016)................................................................. 13, 16

*Hale v. State Farm Mutual Auto. Ins. Co.*,
  No. 12-0660-DRH, 2018 WL 6606079 (S.D. Ill. 2018)..................................... 15

*Howe v. Speedway LLC*,
  19-cv-01374 (N.D. Ill.) ............................................................................... 22

*In re Cap. One Tel. Consumer Prot. Act Litig.*,
  80 F. Supp. 3d 781 (N.D. Ill. 2015) ............................................................. 16

*In re Facebook Biometric Info. Priv. Litig.*,
  No. 15-cv-3747-JD, 522 F.Supp.3d 617 (N.D. Cal. 2021) ............................... 20

*In re Facebook Biometric Info. Priv. Litig.*,
  No. 3:15-cv-03747-JD, 2018 WL 2197546 (N.D. Cal. May 14, 2018)......................... 22

*In re Google LLC Street View Elec. Commc'ns Litig.*,
  No. 10-md-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020)........................ 26

*In re TikTok, Inc., Consumer Priv. Litig.*,
  617 F. Supp.3d 904 (N.D. Ill. 2022) ................................................... 15, 18, 19

*Kolinek v. Walgreen Co.*,
  311 F.R.D. 483 (N.D. Ill. 2015).............................................................. *passim*

*Leung v. XPO Logistics, Inc.*,
  326 F.R.D. 185 (N.D. Ill. 2018)................................................................... 17

*McGoveran v. Amazon Web Servs., Inc.*,
  No. 20-1399-LPS, 2021 WL 4502089 (D. Del. Sept. 30, 2021) ....................... 23

*Norberg v. Shutterfly, Inc.*,
  152 F. Supp. 3d 1103 (N.D. Ill. Dec. 29, 2015)............................................. 21

*Perlin v. Time Inc.*,
    237 F. Supp. 3d 623 (E.D. Mich. 2017)..........................................................25

*Rogers v. BNSF Ry. Co.*,
    No. 19 C 3083, 2023 WL 4297654 (N.D. Ill. June 30, 2023) .........................24

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) .............................................................29

*Thome v. NOVAtime Tech., Inc.*,
    No. 19-cv-6256 (N.D. Ill. Mar. 8, 2021)..................................................26, 29

**State Supreme Court Cases**

*Avery v. State Farm Mut. Auto Ins. Co.*,
    835 N.E.2d 801 (Ill. 2005) ............................................................................23

*Cothron v. White Castle System, Inc.*,
    2023 IL 128004........................................................................................23, 24

*Rosenbach v. Six Flags Ent. Corp.*,
    2019 IL 123186..............................................................................................5

*Tims v. Black Horse Carriers, Inc.*,
    2023 IL 127801........................................................................................23, 24

**State Circuit Court Cases**

*Bernal v. ADP*,
    2017-CH-12364 (Cir. Ct. Cook Cnty. Aug. 23, 2019) ....................................21

*Boone v. Snap Inc.*,
    2022-LA-000708 (Cir. Ct. DuPage Cnty. Nov. 22, 2022) ..........................2, 26

*Carroll v. Crème de la Crème*,
    2017-CH-01624 (Cir. Ct. Cook Cnty.) ...........................................................16

*Kusinski, et al. v. ADP, LLC*,
    2017-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) ....................................26

*Lark, et al v. McDonald's USA, LLC, et al.*,
    No. 17-L-559 (Cir. Ct. St. Clair Cnty. Feb. 28, 2022) ...................................18

*Miracle-Pond v. Shutterfly*,
    2019-CH-07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ................................2, 26

*Prelipceanu v. Jumio Corp.*,
    2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) .................................................. 2, 26

*Rivera v. Google LLC*,
    2019-CH-00990 (Cir. Ct. Cook Cnty. Sept. 28, 2022) ................................................. 18

*Rosenbach v. Six Flags Ent. Corp.*,
    2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) .................................................. 2, 26

## Miscellaneous Authority

5 Newberg and Rubenstein on Class Actions
    § 15:83 (6th ed.) ................................................................................................ 16

740 ILCS 14 ........................................................................................................ *passim*

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
    7 J. Empirical L. Stud. 811 (2010) ...................................................................... 15

Fed. R. Civ. P. 23 ................................................................................................ 12

H.B. 559, 102nd Gen. Assembly (Ill. 2021) ................................................................ 25

H.B. 560, 102nd Gen. Assembly (Ill. 2021) ................................................................ 25

H.B. 1230, 103rd Gen. Assembly (Ill. 2023) .............................................................. 25

H.B. 1764, 102nd Gen. Assembly (Ill. 2021) .............................................................. 25

H.B. 3112, 102nd Gen. Assembly (Ill. 2021) .............................................................. 25

H.B. 3304, 102nd Gen. Assembly (Ill. 2021) .............................................................. 25

H.B. 3414, 102nd Gen. Assembly (Ill. 2021) .............................................................. 25

S.B. 56, 102nd Gen. Assembly (Ill. 2021) ................................................................. 25

S.B. 300, 102nd Gen. Assembly (Ill. 2021) ................................................................ 25

S.B. 1607, 102nd Gen. Assembly (Ill. 2021) .............................................................. 25

S.B. 3874, 102nd Gen. Assembly (Ill. 2022) .............................................................. 25

Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*,
53 UCLA L. Rev. 1303 (2006) ............................................................................ 3

## I.    INTRODUCTION

Over two years ago, Plaintiff Fredy Sosa brought this class action lawsuit against Defendant Onfido, Inc. ("Defendant" or "Onfido")—the vendor of biometric identity verification software—alleging that Onfido collected his and thousands of other Illinois app users' biometric data in violation of the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.*[1] Plaintiff and Class Counsel litigated the case extensively, which included defeating Defendant's motion to compel arbitration, successfully defending that ruling in the Seventh Circuit, defeating Defendant's Rule 12(b)(6) motion to dismiss, obtaining significant informal discovery, and engaging in months of settlement negotiations with Defendant's counsel.

As a result of these efforts, Class Counsel was able to secure a remarkably strong and uniquely structured settlement that accounts for (1) a defense that is arguably unique to a portion of the class and (2) Onfido's current financial state. First, since Onfido has several customers that provide financial-related services, and users of those apps are arguably subject to a defense under Section 25(c) of BIPA that exempts "financial institution[s]," the Settlement creates two Settlement Classes—the Non-Financial Institution Class ("NFI Class") and the Financial Institution Class ("FI Class")—which are represented by Plaintiffs Fredy Sosa and Rohith Amruthur, respectively, and two separate settlement funds. Second, instead of accepting Onfido's current financial state and settling for only what Onfido can pay now, Class Counsel structured the deal so that Onfido must continue to pay into the settlement fund for three years and is subject to harsh penalties if it is late or misses a payment (like a 9% interest rate or losing its release without a refund for the money already paid in).

---

[1]    Capitalized terms used in this motion are those used in the Amended Class Action Settlement Agreement ("Settlement" or "Agreement") attached hereto as Exhibit 1.

With this structure, the Settlement creates two non-reversionary settlement funds of $15,714,404.10 for approximately 200,288 members of the NFI Class and $12,785,595.90 for approximately 472,965 members of FI Class. Assuming a 15-25% claims rate,[2] and after any fees and costs are deducted, each claiming NFI Class Member will receive between $210 and $350, and each FI Class Member will receive between $65 and $110. This result outpaces many of the large BIPA settlements that came before it. *Rosenbach v. Six Flags Ent. Corp.*, 2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) ($36 million reversionary fund for approximately 1,110,000 class members); *Boone v. Snap Inc.*, 2022-LA-000708 (Cir. Ct. DuPage Cnty. Nov. 22, 2022) ($35 million fund for approximately 3.8 million class members); *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($7 million fund for approximately 260,000 class members); *Miracle-Pond v. Shutterfly*, 2019-CH-07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ($6.75 million fund for potentially millions of class members).

The Settlement provides non-monetary relief, too. For Onfido customers with Illinois users, Onfido has agreed to provide those customers with an informed written consent form, instruct them to use that form or the latest version of its software development kit ("SDK") which has a BIPA consent flow embedded, and require those customers to confirm annually that they are complying with BIPA. Onfido has also agreed to implement a BIPA-compliant data retention and deletion policy and adhere to it by actually deleting biometric data on schedule. Moreover, the Settlement preserves any separate BIPA claims class members may have against the Onfido customers who implemented Onfido's biometric software at issue and may have

---

[2]     As of September 14, 2023, 28,581 NFI Class Members (or about 14% of the NFI Class) have submitted a valid claim, and 56,311 FI Class Members (or about 12% of the FI Class) have submitted a valid claim, and there are still three weeks until the October 6, 2023 Claims Deadline. (Declaration of Schuyler Ufkes ("Ufkes Decl."), attached hereto as Exhibit 2, ¶ 13.)

committed separate BIPA violations through their own collection. That means many class members likely stand to receive additional monetary relief, on top of this Settlement, for those customers collection of the same biometric data if they decide to pursue those unreleased claims.

In light of this excellent result, Class Counsel now respectfully move the Court to award 33% of each settlement fund (less the amount paid for notice and the proposed incentive awards) as attorneys' fees and expenses, or $5,015,651.55 from the NFI Class Settlement Fund and $3,870,202.68 from the FI Class Settlement Fund. The requested fee award accurately reflects the fee arrangement that a class member would have entered into with Class Counsel had they made an *ex ante* bargain before heading into litigation like this, given the risks in the case. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001). Moreover, the requested percentage fee award is well in line with common fund fee awards in BIPA cases in this District, (*see* Exhibit 3, Chart 1 (listing 33% fee awards in BIPA cases in the Northern District)) and is in fact less as a percentage than that commonly awarded in BIPA cases, (*see id.*, Charts 2 and 3 (listing 35–40% fee awards)).

The requested incentive awards of $5,000.00 for each Plaintiff is similarly reasonable. Incentive awards in class action settlements frequently exceed $10,000.00. *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1348 (2006) (finding that "[t]he average award per class representative was $15,992"). Plaintiffs' requested awards reflect their participation in this case—including Plaintiff Sosa's efforts throughout the litigation since day one and Plaintiff Amruthur's willingness to step up to represent the FI Class at a critical junction in the case—and is comfortably in line with what has been awarded in similar BIPA cases in this District. (*See*

Exhibit 3, Chart 4 (listing incentive awards of $5,000, $7,500, and $10,000 in BIPA cases).)

Plaintiffs' requested fees and incentive award are reasonable and warrant the Court's approval.

## II.     BACKGROUND

A brief summary of the underlying facts and law will lend context to the instant motion and demonstrate the reasonableness of the requested fees and incentive award.

### A.     BIPA and the Underlying Claims

BIPA is landmark privacy law in Illinois and one of the country's only meaningful regulations on the collection and use of biometric data. Recognizing the "very serious need" to protect Illinois citizens' biometric data—which includes retina scans, fingerprints, voiceprints, and scans of hand or face geometry—the Illinois legislature unanimously passed BIPA in 2008 to provide individuals recourse when companies failed to appropriately handle their biometric data in accordance with the statute. (*See* First Amended Complaint, ("FAC"), dkt. 64 ¶ 16); 740 ILCS 14/5. Thus, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information . . . "

740 ILCS 14/15(b). BIPA also establishes standards for how companies must handle Illinois citizens' biometric identifiers and biometric information. For example, BIPA requires companies to develop and comply with a written policy establishing a retention schedule and guidelines for

permanently destroying biometric information. 740 ILCS 14/15(a). As a means of enforcement, BIPA provides a civil private right of action and allows for the recovery of statutory damages in the amount of $1,000 for negligent violations or $5,000 for willful violations, plus costs and reasonable attorneys' fees, to any person "aggrieved by a violation" of the statute. *See* 740 ILCS 14/20.

As the Illinois Supreme Court assessed the legislature's intent in passing BIPA, the statute:

> vests in individuals and customers the right to control their biometric information by requiring notice before collection and giving them the power to say no by withholding consent. . . . These procedural protections are particularly crucial in our digital world because technology now permits the wholesale collection and storage of an individual's unique biometric identifiers—identifiers that cannot be changed if compromised or misused. When a private entity fails to adhere to the statutory procedures . . . the right of the individual to maintain her biometric privacy vanishes into thin air. The precise harm the Illinois legislature sought to prevent is then realized. This is no mere technicality. The injury is real and significant.

*Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 34 (internal citations and quotations omitted).

This case arises from Plaintiffs' experiences on certain apps that partner with Onfido to provide identity verification services. (FAC ¶¶ 37, 44.) It works like this: users are prompted to upload their photo ID and a selfie, both images are sent to Onfido, and Onfido's software "extract[s] and compare[s] numerical biometric data" from the faces detected in each image to ensure that the faces depicted in the two images are the same (or at least meet a similarity threshold), Plaintiffs allege. (*Id.* ¶ 26.) Plaintiffs further allege that Onfido stores this information in a database called "Known Faces," against which it compares any uploaded image. (*Id.* ¶ 29.)

Neither Plaintiff Sosa nor Plaintiff Amruthur knew that the apps they used partnered with Onfido to perform facial recognition and comparison, or that the images they uploaded would be

sent to Onfido for this purpose. (*Id.*) Plaintiff Sosa verified his identity in order to use an online consumer-to-consumer marketplace, and Plaintiff Rohith Amruthur verified his identity in order to use a financial services app. (*Id.* ¶¶ 37, 44.) Once Plaintiffs had uploaded images of their face, Onfido extracted biometric identifiers from these images in order to identify the Plaintiffs. (*Id.*) Plaintiffs claim that through this process, Onfido collected, stored, and used their and the class's biometric information in violation of BIPA. (*Id.* ¶¶ 22-34.) Specifically, Plaintiffs allege that Onfido violated section 15(a) of BIPA by (i) failing to develop a retention policy and guidelines for permanently destroying biometric data, (ii) failing to publicly disclose any such policy, and (iii) failing to comply with any such policy (by actually deleting the data). (*Id.* ¶¶ 31-32, 60-61.) Plaintiffs further allege that Onfido violated section 15(b) of BIPA by collecting, using, and storing their and other Illinoisans' biometric data without obtaining their informed, written consent. (*Id.* ¶¶ 59, 61.)

### B. Litigation History and the Work Performed for the Settlement Classes

Plaintiff Sosa originally filed this putative class action case in the Circuit Court of Cook County, Illinois, on June 12, 2020, alleging that Onfido violated sections 15(a) and 15(b) of BIPA. Onfido then timely removed the case, (dkt. 1), and moved to compel arbitration of Sosa's claim (dkt. 20). Onfido argued that when Sosa signed up for OfferUp—an online marketplace that partnered with Onfido, and where Sosa did the biometric identity verification at issue—he agreed to an arbitration clause in OfferUp's terms of service, and that Onfido was entitled to enforce the arbitration agreement under three theories: third-party beneficiary, equitable estoppel, and agency. (Dkt. 21.) Class Counsel, on behalf of Plaintiff Sosa, opposed the motion, arguing that Onfido as a non-signatory who was not mentioned at all in OfferUp's terms of service, could not enforce the arbitration between Sosa and OfferUp, and that none of Onfido's

offered exceptions for non-signatories apply here. (Dkt. 26.) Specifically, Class Counsel argued that Onfido is not an intended third-party beneficiary of the OfferUp Terms of Service (which, among other things, expressly disclaimed the creation of any third-party rights), Sosa engaged in no conduct on which Onfido relied to its detriment such that he was equitably estopped from disputing Onfido's ability to enforce the OfferUp arbitration clause, and Onfido presented no evidence that it was OfferUp's agent such that it could invoke OfferUp's arbitration agreement. (*Id.*) Onfido then filed a reply brief. (Dkt. 29.) On January 5, 2021, this Court agreed with Class Counsel and denied Onfido's motion in full. (Dkt. 31.)

Onfido took an immediate appeal to the Seventh Circuit. After full briefing and oral argument, the Court of Appeals affirmed this Court's decision in a written opinion, holding that Illinois law did not permit Onfido, a non-signatory who was not mentioned in the terms of service, to invoke the arbitration clause governing the relationship between Sosa and OfferUp. *Sosa v. Onfido Inc.*, 8 F.4th 631 (7th Cir. 2021).

Back in this Court, Onfido moved to dismiss under Rule 12(b)(6), arguing that its conduct is outside the scope of BIPA due to its exemption for "information derived from" photographs, that Sosa failed to plead Onfido's state of mind in violating BIPA such that he cannot recover statutory damages, and that applying BIPA to Onfido's product would violate the First Amendment. (Dkt. 46.) Again, Class Counsel vigorously opposed the motion, first arguing that Onfido's conduct is plainly covered by BIPA because its definition of "biometric identifier" includes a scan of face geometry collected from a photograph. (Dkt. 49.) Class Counsel further argued that pleading a BIPA claim does not require allegations of state of mind and, in any event, Onfido ignores that Sosa included allegations of negligent, reckless, and intentional conduct. (*Id.*) Finally, Class Counsel argued that Onfido's First Amendment challenge identified

no speech that Onfido is prohibited from engaging in and depended on the incorrect premise that there is no state interest in protecting consumer privacy. (*Id.*) After the motion was fully briefed, this Court *sua sponte* ordered the Parties to address whether Sosa has Article III standing to assert his claim under section 15(a) of BIPA, in light of the Seventh Circuit's rulings in *Bryant v. Compass Group USA, Inc.*, 958 F.3d 617 (7th Cir. 2020) and *Fox v. Dakkota Integrated Systems, LLC*, 980 F.3d 1146 (7th Cir. 2020). (Dkt. 52.) Both Parties did so on December 23, 2021. (Dkts. 54, 55.) On April 25, 2022, this Court issued an opinion finding that Sosa has Article III standing to pursue both his Section 15(a) and 15(b) claims and denying Onfido's Rule 12(b)(6) motion on all grounds. (Dkt. 58.) Onfido then answered the complaint, raising 21 affirmative defenses. (Dkt. 59.)

With the pleadings settled, the Court entered a scheduling order, and the Parties began discovery. (Dkt. 62.) The Parties exchanged initial disclosures on July 7, 2022, and Plaintiff Sosa served his first set of interrogatories and requests for production to Onfido on August 17, 2022. (Ufkes Decl. ¶ 3.) One of Class Counsel's goals at the start of discovery was to determine the class size, so that the Parties could start to engage in informed settlement discussions. After several conversations between counsel, Onfido agreed to informally provide information about the size and composition of the putative class, which revealed that Onfido has a variety of different clients to whom it provides biometric identity verification services, many of whom are in the financial sector and might themselves be able to claim an exemption from BIPA as a financial institution under section 25(e). (*Id.* ¶ 4.)

After learning of Onfido's financial-related customers, and after it became clear Onfido was interested in discussing a class-wide resolution, Class Counsel understood that a global resolution would require two classes and an additional class representative to represent users of

financial-related apps—since Sosa verified his identity using OfferUp, which is not in the financial space. (*Id.* ¶ 5.) An additional class member, Rohith Amruthur, stepped forward and indicated his willingness to represent class members like him who had their identity verified by Onfido while using financial apps. (*Id.*)

As the Parties began to prepare for a lengthy discovery period, they also engaged in settlement discussions. As part of these discussions, Class Counsel reviewed Onfido's financial statements over the past four years, and factored Onfido's financial limitations into the settlement negotiations. (*Id.* ¶ 6.) Over the course of five months, during which further informal discovery was exchanged, the Parties agreed to the principal terms of a settlement agreement and executed a binding memorandum of understanding on December 3, 2022. (*Id.* ¶ 7.) After three months of additional negotiation over the final terms of the settlement, the Parties executed the full written settlement agreement, (*id.* ¶ 8) and Plaintiffs moved for preliminary approval on March 13, 2023, (dkt. 67).

Soon after, the Court requested additional information from the Parties to consider at preliminary approval and suggested a handful of helpful changes to the settlement agreement and notice documents. (Dkt. 68.) Class Counsel then provided the Court the requested information in a supplemental motion for preliminary approval (dkt. 69), the Parties implemented many of the Court's suggested changes and executed and filed an Amended Settlement Agreement (dkt. 71), the Court granted preliminary approval of the Amended Settlement Agreement on May 5, 2023, (dkt. 73).

But Class Counsel's work was not over once preliminary approval was secured. To compile the Class List and ensure that as many class members as possible would receive direct notice of the Settlement, the Settlement Agreement set forth a detailed procedure for obtaining

the names, addresses, and e-mail addresses ("Contact Information") of the class members.

(Agreement § 4.1.) Many of Onfido's customers voluntarily provided Contact Information to the

Settlement Administrator, but three did not. Class Counsel subpoenaed each of those customers,

resulting in thousands of additional class members being notified of their rights under the

settlement. (Ufkes Decl ¶ 9.)

### C. The Settlement Secures Excellent Relief for the Settlement Class

As detailed in Plaintiffs' motion for preliminary approval, even putting aside Onfido's

current financial position, the relief Class Counsel was able to secure the Settlement Classes is

outstanding. The Settlement creates two non-reversionary funds: a $15,714,404.10 fund for the

NFI Class and a $12,785,595.90 fund for the FI Class. Each fund will be split *pro rata* between

approved claimants after deductions for Court-approved fees and costs. As of yesterday, 28,581

NFI Class Members (or about 14% of the NFI Class) have submitted a valid claim, and 56,311

FI Class Members (or about 12% of the FI Class) have submitted a valid claim, and there are still

three weeks left until the October 6th Claims Deadline. (Ufkes Decl. ¶ 13.) Assuming the claims

rates for both classes end up between 15% and 25% (as Class Counsel expected in their

preliminary approval papers), each claiming NFI Class Member will receive between $210 and

$350, and each FI Class Member will receive between $65 and $110.

Because Onfido has demonstrated it can't fund the whole settlement at once, the deal

allows Onfido to pay into the settlement funds on a rolling basis, following the schedule detailed

in Exhibit A to the Agreement. Class Counsel has incentivized Onfido to stay on schedule: if it

makes a late payment, it must pay interest at 9% per annum, and if it misses a payment, Onfido

loses its release under the settlement without recourse for any amount Onfido has already

deposited into the Escrow Accounts, and the Parties go back to litigating. (Agreement § 2.3.) As

a result of this payment plan, the settlement payments and any awarded attorneys' fees will also be disbursed on a rolling basis as the funds come in. Claimants opting for payment via paper check will receive their *pro rata* share of their relevant settlement fund in two installment checks over three years, considering the added costs of printing and mailing checks. (*Id.* § 2.1(d), Exhibit A.) Claimants who select an electronic payment method will receive four installment payments over three years—the first payment will be made 28 days after the Effective Date, the second will be one year and 60 days after the Effective Date, the third will be two years and 60 days after the Effective Date, and the fourth will be three years and 60 days after the Effective Date. (Agreement § 2.1(c), Exhibit A.) Class Counsel will be paid any attorneys' fees on the same schedule as the electronic payments are made and in the same proportions. (Agreement § 8.2.) For example, if the Court awards 33% in fees, Class Counsel will be paid 33% of the amount distributed to class members each time payments are distributed to class members.

Aside from the monetary relief, the Settlement creates non-monetary benefits as well. Onfido has agreed to create, post on its website, and abide by, a public policy governing the retention and deletion of biometric data. (*Id.* § 2.4.) Onfido has also committed to developing and implementing a consent form, including one embedded within its software development kit (SDK), which will alert users to Onfido's collection of biometric data and require for their prior informed written consent (*Id.*) Onfido has agreed to distribute the consent form to its customers and instruct them to use the latest releases of Onfido's SDK, which implements the consent form, or otherwise instruct that equivalent language is viewed and agreed to by users who reside in Illinois before Onfido performs any identity verification on those users. (*Id.*) Finally, Onfido has agreed to require customers that have users who reside in Illinois to confirm annually, for the

next two years, that they are either using the informed written consent forms provided by Onfido or are otherwise complying with BIPA. (*Id.*)

Finally, beyond this case, the Settlement explicitly preserves all of Plaintiffs' and the Settlement Classes' claims against Onfido's customers, including BIPA claims. (*Id.* § 1.33.) With this carve-out, Plaintiffs and the Settlement Classes may pursue separate BIPA claims against the respective customers who partnered with Onfido to perform biometric identity verification—individually or on a class basis—for additional monetary and prospective relief for any customer's violations of BIPA.

## III. THE REQUESTED ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS ARE REASONABLE AND SHOULD BE APPROVED.

Rule 23 authorizes courts to "award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In common fund settlements like this one, the attorneys' fee award is typically made as a share of the fund. The Seventh Circuit has consistently directed "that attorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services," *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013), taking into account "the risk of nonpayment and the normal rate of compensation in the market at the time." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007); *see also In re Synthroid*, 264 F.3d at 719 (cautioning that "any method other than looking to prevailing market rates assures random and potentially perverse results"). In making this determination, "the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014).

Ultimately, district courts "must set a fee by approximating the terms that [the class and

class counsel] would have been agreed to *ex ante*, had negotiations occurred." *Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246–47 (7th Cir. 2014). Because "[s]uch estimation is inherently conjectural," *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011), and the Seventh Circuit does not prescribe a preferred method of calculation, "in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court." *Americana Art*, 743 F.3d at 247. (citation omitted).

Finally, notice and administration costs or incentive awards are not included as part of the fund in making percentage-of-the-fund fee awards. *See Redman*, 768 F.3d at 630 ("The ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received.") Here, on September 13, 2023, the Settlement Administrator confirmed its total cost estimates attributable to each class: $510,460 for the NFI Class and $1,052,709 for the FI Class. (Ufkes Decl. ¶ 14.) With this information, the Court may award attorneys' fees without unexpected additional expenses coming up later that change the ratio. *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 238 (N.D. Ill. 2016). Accordingly, the $5,015,651.55 fee request for the NFI Class represents 33% of the "Net NFI Class Settlement Fund," that is, after deducting from the NFI Class Settlement Fund (1) the $510,460 in total notice and administration costs for the NFI Class, and (2) the $5,000 proposed incentive award to Plaintiff Sosa. (*See* Ufkes Decl. ¶¶ 14, 15.) Similarly, the $3,870,202.68 fee request for the FI Class represents 33% of the "Net FI Class Settlement Fund," that is, after deducting from the FI Class Settlement Fund (1) the $1,052,709 in total notice and administration costs for the FI Class, and (2) the $5,000 proposed incentive award to Plaintiff Amruthur. (*See id.*)

13

Class Counsel took this case on a contingent basis despite the high risks of no recovery at the outset. (Ufkes Decl. ¶ 11.) Now that Class Counsel has achieved the results they did for the Settlement Classes, they respectfully request that, after deducting the total amount of notice and administration costs and the proposed incentive awards from each settlement fund, the Court award Class Counsel 33% of the Net NFI Settlement Fund, or $5,015,651.55, and 33% of the Net FI Settlement Fund, or $3,870,202.68, for a total of $8,885,854.23 in attorneys' fees and expenses.[3] This request is well in line with what other courts in this District have found a hypothetical *ex ante* bargain to be in BIPA cases as set out in the Charts in Exhibit 3. Accordingly, the requested fees should be approved.

A. **Percentage-of-the-Fund Should be Used to Determine Fees Here.**

In the Seventh Circuit, district courts deciding common fund cases may choose one of two methods for awarding attorneys' fees: (1) percentage-of-the-fund or (2) lodestar approach. *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500 (N.D. Ill. 2015). Under the percentage-of-the-fund approach, "plaintiffs' attorneys . . . petition the court to recover its fees" as a percentage of the available fund. *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 563 (7th Cir. 1994). In contrast, the lodestar approach requires district courts to determine the reasonable value of the services rendered and increase that amount by a multiplier that factors in various considerations. Under the lodestar approach, the court first determines a "reasonable hourly rate allowable for each attorney . . . involved in the case." *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991). Then, the court multiplies "the hours reasonably expended by the reasonable hourly rates" to produce the lodestar. *Id.* Finally, the court adjusts the lodestar by a multiplier

---

[3] The requested fee amount is inclusive of the costs fronted by Class Counsel—*i.e.*, Class Counsel is not requesting costs separately.

that accounts for other relevant considerations, such as the attorneys' amount of risk in bringing the case or the complexity of the issues. *See id*.

While the court has discretion over whether to use the percentage-of-the-fund or lodestar approach, courts typically select a method by looking "to the calculation method most commonly used in the marketplace at the time such a negotiation would have occurred." *Kolinek*, 311 F.R.D. at 501. The normal practice in BIPA class actions is, overwhelmingly, to agree to "a fee arrangement based on a percentage of the plaintiffs' ultimate recovery." *Id.*; *see Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the prevailing method of compensating lawyers for similar services is the contingent fee, then the contingent fee *is* the market rate.") (internal quotes omitted). Because the percentage-of-the-fund approach best mirrors typical contingency agreements, it makes sense that "the vast majority of courts in the Seventh Circuit" use it in common fund cases. *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *7 (S.D. Ill. Dec. 16, 2018) (quotation omitted); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 814 (2010) ("Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method.").

A percentage-of-the-fund, contingent approach is what the class would have negotiated with Class Counsel at the outset in a hypothetical *ex ante* bargain; in fact, it has been used to determine a reasonable fee award in virtually every BIPA class action settlement in both federal and state courts. (*E.g.*, Exhibit 3.) *See also In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp.3d 904 (N.D. Ill. 2022). In contrast, the lodestar approach has never been used to evaluate

fees in any BIPA case where the class received a monetary benefit.[4] That makes sense because the lodestar method would have "required a level of monitoring the class members were not interested in or capable of providing," and the percentage approach best "align[s] the incentives of the class[es] and [their] counsel." *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 795 (N.D. Ill. 2015). Further, courts in the Seventh Circuit are not required to "crosscheck" the percentage fee award by examining counsel's lodestar. *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (explaining that "consideration of a lodestar check is not an issue of required methodology".)

The percentage-of-the-recovery is the most appropriate method here.

**B.      A 33% Fee Award of Each Fund Is Appropriate Here.**

The Seventh Circuit has instructed district courts to award reasonable attorneys' fees, and that "the measure of what is reasonable is what an attorney would receive from a paying client in a similar case." *Montgomery v. Aetna Plywood*, 231 F.3d 399, 408 (7th Cir. 2000). "[I]n consumer class actions . . . the presumption should . . . be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Gehrich*, 316 F.R.D. at 235 (citing *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014)); *see also* 5 William Rubenstein, NEWBERG ON CLASS ACTIONS § 15:83 (6th ed.) (noting that, generally, "50% of the fund is the upper limit on a reasonable fee award from any common fund"). Courts consider, against that presumption, the benefit achieved for the class, the fee awards made in similar cases, the risks that the particular case presented, the quality of the legal work provided, the anticipated work necessary to resolve the litigation, and

---

[4]      The one exception is *Carroll v. Crème de la Crème*, 2017-CH-01624 (Cir. Ct. Cook Cnty.), which produced no monetary recovery for the class and instead provided credit monitoring.

the stakes of the case. *See Redman*, 768 F.3d at 633 ("[T]he central consideration is what class counsel achieved for the members of the class"); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) ("[A]ttorneys' fees from analogous class action settlements are indicative of a rational relationship between the record in this similar case and the fees awarded by the district court.").

Considering these factors, the Court can confidently find that a hypothetical *ex ante* negotiation would have resulted in at least the 33% of each fund Class Counsel now seek; indeed, in similar BIPA cases, courts in this District have routinely awarded at least 33% of the net fund. (*See* Exhibit 3, Chart 1.) The *ex ante* negotiation could have well resulted in an agreement *higher* than the requested 33% of each fund, as numerous other Illinois courts, including those in this District, have awarded as much as 35% of the fund in BIPA cases, (*see id.*, Chart 2), and others have awarded up to 40% of the fund in state court where this case originated, (*see id.*, Chart 3). *See also Kolinek*, 311 F.R.D. at 503 (in TCPA settlement with $11 million gross fund, awarding 36% of net fund in fees). Accordingly, the requested award is more than appropriate and is what the class would have agreed to in an *ex ante* negotiation. *See Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 201 (N.D. Ill. 2018) ("[A] typical contingency agreement in this circuit might range from 33% to 40% of recovery.").

An *ex ante* fee negotiation also would have applied a flat percentage, not a declining marginal percentage scale or "sliding-scale" approach occasionally used in large class actions. Under the sliding-scale approach, the percentage allocated for attorneys' fees decreases as the size of the recovery or settlement increases. *See Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741, at *3-6 (N.D. Ill. Apr. 10, 2017), *aff'd sub nom. Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018) (awarding 36% in fees for the first

$10 million recovered, 25% for the second $10 million, 20% for the band from $20 million to $45 million, and 15% for the remainder). Declining fee scales like this are used to balance the need for incentivizing attorneys to secure higher settlements, while also ensuring a fair distribution to class members, recognizing that larger recoveries often depend more on the number of class members than increased efforts from class counsel in determining liability. *But see In re Synthroid*, 264 F.3d at 721 ("This is not to say that systems with declining marginal percentages are always best. They also create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client.") The sliding-scale approach has never been used in a BIPA case, not even where funds have reached $100 million. *See Lark, et al. v. McDonald's USA, LLC, et al.*, No. 17-L-559 (Cir. Ct. St. Clair Cnty. Feb. 28, 2022) ($50 million reversionary fund); *In re TikTok*, 617 F. Supp.3d at 949 ($92 million fund); *Rivera v. Google LLC*, 2019-CH-00990 (Cir. Ct. Cook Cnty. Sept. 28, 2022) ($100 million fund).

The Seventh Circuit's recent decision in *In re Stericycle Securities Litigation* does not call for the use of the "sliding-scale" approach in all cases. 35 F.4th 555 (7th Cir. 2022). In *Stericycle*, the Seventh Circuit reversed a fee award of 25% of a $45 million fund because the district court failed to consider the existence of an actual *ex ante* fee agreement between the parties that included a sliding-scale formula. *Id.* at 560-61. The Seventh Circuit also noted how the district court failed to give sufficient weight to how early in the litigation the parties settled and how prior litigation with the defendant reduced counsel's risk of non-payment. *Id.* None of that is present here—the only *ex ante* fee agreements available (to the extent they're useful) are Plaintiffs' retention agreements that provide for a percentage of the total recovery in fees (not a sliding scale), and the Parties litigated this case tooth and nail for over two years, including up to

the Seventh Circuit, before settling. In any event, "*Stericycle* did not create a general presumption in favor of a sliding-scale approach for large cases." *In re TikTok*, 617 F. Supp.3d at 940 (awarding a flat 33.3% fee out of $87 million net fund). Rather, it merely "spoke approvingly of using a sliding-scale approach in cases where an actual *ex ante* fee agreement also has adopted a sliding-scale formula," *id.*, which reaffirms decades of Seventh Circuit precedent—that fee awards must "reflect the market-based approach." *In re Stericycle Sec. Litig.*, 35 F.4th at 560.

For the sake of completeness, if the Court were to apply a sliding scale to the NFI Class Settlement Fund and FI Class Settlement Fund here, the resulting fee award would be nearly identical to the requested 33% of each net fund. *See In re Synthroid*, 264 F.3d at 722 ("Any use of a sliding scale should be based solely on each class's settlement, not the total amount recovered by the two classes."). Using the bands Judge Kennelly used in *Aranda*—a similar statutory privacy case, but under the TCPA, that also involved a considerable risk of non-recovery—a sliding-scale would result in a composite 32.24% fee for the NFI Class and a composite 34.38% fee for the FI Class, as shown in Figures 2 and 3 below. 2017 WL 1369741, at *7. Put differently, Class Counsel would receive $115,915.53 less from the NFI Class Settlement Fund and $161,769.05 more from the FI Class Settlement Fund under the sliding-scale approach.

| Flat Percentage Fee Requests | NFI Class | FI Class |
|---|---|---|
| Settlement Funds | $15,714,404.10 | $12,785,595.90 |
| Settlement Admin Expenses | $510,460.00 | $1,052,709.00 |
| Requested Incentive Awards | $5,000.00 | $5,000.00 |
| Net Settlement Funds | $15,198,944.10 | $11,727,886.90 |
| Requested Fee Percentages | 33.00% | 33.00% |
| Requested Fees | $5,015,651.55 | $3,870,202.68 |

**Figure 1**

| Sliding Scale for NFI Class | | |
|---|---|---|
| Recovery Bands | Percentage | Fee |
| First $10 million | 36.00% | $3,600,000.00 |
| Next $10 million | 25.00% | $1,299,736.03 |
| Total Fee | 32.24% | $4,899,736.03 |

Figure 2

| Sliding Scale for FI Class | | |
|---|---|---|
| Recovery Bands | Percentage | Fee |
| First $10 million | 36.00% | $3,600,000.00 |
| Next $10 million | 25.00% | $431,971.73 |
| Total Fee | 34.38% | $4,031,971.73 |

Figure 3

Nor does the Seventh Circuit's recent decision in *In re Broiler Chicken Antitrust Litigation* change the result here. No. 22-2889, 2023 WL 5599636 (7th Cir. Aug. 30, 2023). There, the court found that the district court abused its discretion in its *ex ante* fee analysis by failing to consider (1) *ex ante* bids made by class counsel in auctions in the same type of cases (antitrust litigation), and (2) out-of-circuit fee awards to class counsel, particularly those in the Ninth Circuit where counsel was awarded fees under the megafund doctrine (which the Seventh Circuit does not follow). *Id.* at *3–6. Neither of those concerns are at issue here: Class Counsel Edelson PC has made no bids—*ex ante* or otherwise—in BIPA cases for the Court to consider, and the only fee award Edelson PC has obtained in a BIPA case outside of Illinois was in the $650 million *In re Facebook Biometric Info. Priv. Litig.*, No. 15-cv-3747-JD, 522 F.Supp.3d 617, 620 (N.D. Cal. 2021) settlement, which Edelson PC originally filed in Illinois and were forced to litigate in the Northern District of California due to a contractual forum selection clause. *See In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636 at *5 (explaining that "as rational actors, class counsel assess the risk of being awarded fees below the market rate of their legal services when they seek to represent plaintiffs in the Ninth Circuit"). Accordingly, *In re Broiler Chicken Antitrust Litigation* is inapposite here.

The appropriateness of a 33% fee award here is further justified by (1) the substantial risk

that Class Counsel took on in accepting the case, and (2) the excellent relief Class Counsel ultimately obtained for the Settlement Class.

> **1.  This case presented serious obstacles to recovery, and Class Counsel litigated the case mindful of the high possibility that the class might recover nothing.**

In a hypothetical *ex ante* negotiation, it would be apparent to the client that at least a 33% contingent fee would be appropriate considering the significant risk Class Counsel took on in litigating a case mired in issues of first impression. (Ufkes Decl. ¶ 10.) Compared to typical contingent-fee litigation, the risks here were particularly acute at the outset because the Parties were likely to litigate a number of issues that are either still being resolved by the courts or were matters of first impression, as demonstrated by the number of issues Class Counsel have already litigated in this case. *See Silverman*, 739 F.3d at 958 ("Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel."). Class Counsel filed this case aware of these risks but confident in their ability to achieve a superior result for the classes—which they ultimately did.

Although these risks are inherent in any contingent-fee litigation, class actions especially, there were particularly acute risks here that increased the risk of nonpayment, considering the relative infancy of BIPA. *See Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103, 1106 (N.D. Ill. 2015) ("The BIPA was enacted in 2008, and to this date, the Court is unaware of any judicial interpretation of the statute.") First, at the time of filing, it was still unclear whether vendors of biometric technology (like Onfido) could be held liable for BIPA violations. *Compare Bernal v. ADP*, 2017-CH-12364 (Cir. Ct. Cook Cnty. Aug. 23, 2019) (Atkins, J.), attached hereto as Exhibit 4, *with Figueroa v. Kronos Inc.*, 454 F. Supp. 3d 772, 784-85 (N.D. Ill. 2020). With the

liability of vendors an unresolved issue, Class Counsel took on significant risks in establishing that a vendor like Onfido, who had no direct interactions with end users, had an obligation under BIPA to obtain their prior informed written consent before customers could use Onfido's backend servers to complete identity verification.

Second, Class Counsel pursued this case sure that Onfido would argue at summary judgment and/or trial that its software didn't collect a "scan of face geometry" subject to BIPA, but rather a facial "embedding" or "template," consisting of a string of numbers and letters that isn't regulated by the statute at all. *See* 740 ILCS 14/10. This question is the subject of dispute in existing BIPA cases and hasn't yet been resolved by the courts. *Cf. In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-CV-03747-JD, 2018 WL 2197546, at *2–3 (N.D. Cal. May 14, 2018) (denying motion for summary judgment on whether facial scans were biometric data regulated by BIPA); *Howe v. Speedway LLC*, No. 19-cv-01374, dkts. 125, 140, 149 (N.D. Ill.) (fully briefed motion for summary judgment on this issue in a fingerprint scan case). Unlike Onfido's Rule 12(b)(6) argument that information derived from photographs are not subject to BIPA, which the Court rejected (dkt. 58), this argument would require intensive fact and expert discovery into Onfido's source code to determine whether any "scan" was taken of Plaintiffs' faces, and if so, whether the information processed is considered "face geometry." Although Class Counsel puts little stock in this argument and expect discovery would put it to rest, it is an issue ungoverned by precedent, and if Onfido were to win on it at summary judgment or trial, Plaintiffs' case would be defeated entirely, sinking Class Counsel's substantial investment of time and effort in this case.

Third, Onfido is a California company, and nothing in Class Counsel's pre-suit investigation suggested that any of Onfido's alleged actions occurred in Illinois (other than the

transmission of photographs and IDs from class members), opening Plaintiffs to the risk that subjecting Onfido to BIPA would be an improper extraterritorial application of Illinois law. *See Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 852–53 (Ill. 2005). While the majority of courts have found that "the [Illinois] General Assembly contemplated BIPA's application to individuals who are located in Illinois, even if some relevant activities [like server location] occur outside the state," *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019), other courts have immunized out-of-state biometric technology vendors on extraterritoriality grounds. *See McGoveran v. Amazon Web Servs., Inc.*, No. 20-1399-LPS, 2021 WL 4502089, at *4 (D. Del. Sept. 30, 2021) (dismissing BIPA voiceprint claims where plaintiff only alleged that she was an Illinois resident and that defendant intercepted her voice audio from Illinois, and where defendant's servers were located outside of Illinois). Had this Court found that Plaintiffs' residency, along with submitting their photographs and Illinois IDs from Illinois, was not enough, this case would have ended with no relief to the class or fees to Class Counsel.

Fourth, when this case was filed, it was still unclear whether a one-, two- or five-year statute of limitations applied to BIPA claims. Class Counsel nonetheless expended significant resources on this case knowing that if a one-year limitations period applied, many class members' claims would be time-barred, which would reduce the size of the class and, in turn, the potential fees to Class Counsel. It wasn't until this past February that the Illinois Supreme Court finally clarified that a five-year statute of limitations applies to all BIPA claims, reversing the First District's previous decision that a one-year period applied to claims under sections 15(c) and (d) of BIPA. *Tims v. Black Horse Carriers, Inc.*, 2023 IL 127801. Similarly, until the Illinois Supreme Court's recent decision in *Cothron v. White Castle System, Inc*., 2023 IL 128004, it was unclear whether BIPA claims accrue for limitations purposes based on the first or last time a

defendant collects a plaintiff's biometric data. Similar to *Tims*, had the Court in *Cothron* held that a claim accrues only upon the first collection, many class members' claims could have been extinguished, decreasing the value of this case.

Fifth, Class Counsel took on this case knowing that obtaining *any* relief under BIPA, including statutory damages, is discretionary, not mandatory—a point that the Illinois Supreme Court recently emphasized in *Cothron*, 2023 IL 128004, ¶ 42. *See* 740 ILCS 14/20 (private right of action stating that "[a] prevailing party *may* recover" each type of relief) (emphasis added). That means Class Counsel took on this case aware of the risk that, even if they defeated Onfido's motions to dismiss, certified a class, won at summary judgment and trial, and defeated any appeals along the way, a court could adjust a damages award and any resulting fee. *See Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2023 WL 4297654, at *10 (N.D. Ill. June 30, 2023) (vacating pre-*Cothron* damages award of $5,000 per class member and ordering new trial for jury to determine the amount of damages).

Class certification also remains unanswered, as does the class's ability to actually recover—post-trial—what would be massive damages against Onfido. *See, e.g.*, *Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) (statutory award in TCPA class action of $1.6 billion reduced to $32 million); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022) (in TCPA case, vacating district court's denial of defendant's post-trial motion challenging the constitutionality of $925 million statutory damages award under TCPA and remanding for further proceedings); *but see United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020), *cert. dismissed*, 141 S. Ct. 729 (2021) (statutory award of $280 million for violating various telemarketing statues over 65 million times did not violate due process). Finally, the attempts to gut BIPA in the legislature have been relentless—over the past three years, at least

eleven such bills have been introduced to amend or repeal BIPA[5]— and it is not unprecedented for legislation to be amended while a class action is pending in a way that threatens the class's entire recovery. *See Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 629–30 (E.D. Mich. 2017) (evaluating the retroactive effect of legislative amendment on pending class action).

Class Counsel accepted this case understanding that a single loss on any of these fronts would decimate the class's—and Class Counsel's—ability to recover. In light of those risks, it is appropriate to award a flat 33% of the Net NFI Class Settlement Fund and Net FI Class Settlement Fund in attorneys' fees. *See Kolinek*, 311 F.R.D. at 502–03 (adding 6% risk premium to attorneys' fees "based on the degree of effort the attorneys would need to put in, the likelihood of success, and the risks associated with undertaking class representation" when case was filed).

### 2. Class Counsel achieved an excellent result for the classes.

Given the large number of unresolved questions in BIPA vendor cases, and the possibility that the Settlement Classes would recover nothing at all, the relief secured by Class Counsel is exceptionally strong. It is appropriate, too, for the Court to consider the actual result achieved— both as a function of the quality of Class Counsel's work, and because litigants often consider the ultimate degree of success in determining a fee schedule. *See Americana Art*, 743 F.3d at 247.

Here, assuming a 15 to 25% claims rate, NFI Class Members will receive between $210 and $350, and FI Class members will receive between $65 and $110. Against a backdrop where

---

[5]     *See* H.B. 1230, 103rd Gen. Assembly (Ill. 2023); S.B. 3874, 102nd Gen. Assembly (Ill. 2022); H.B. 559, 102nd Gen. Assembly (Ill. 2021); H.B. 560, 102nd Gen. Assembly (Ill. 2021); H.B. 1764, 102nd Gen. Assembly (Ill. 2021); H.B. 3112, 102nd Gen. Assembly (Ill. 2021); H.B. 3304, 102nd Gen. Assembly (Ill. 2021); H.B. 3414, 102nd Gen. Assembly (Ill. 2021); S.B. 56, 102nd Gen. Assembly (Ill. 2021); S.B. 300, 102nd Gen. Assembly (Ill. 2021); S.B. 1607, 102nd Gen. Assembly (Ill. 2021).

many privacy claims under similar statutes settled for pennies on the dollar or no monetary relief at all, this is an exceptional result. *See, e.g.*, *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 740 (9th Cir. 2017), *vacated on other grounds by Frank v. Gaos*, 139 S. Ct. 1041 (2019) (approving 25% award of attorneys' fees on *cy pres*-only fund with not a penny to class members); *In re Google LLC Street View Elec. Commc'ns Litig.*, No. 10-md-02184-CRB, 2020 WL 1288377, at *11–14 (N.D. Cal. Mar. 18, 2020) (approving, over objections of class members and state attorney general, a settlement providing only *cy pres* relief for violations of the Electronic Communications Privacy Act); *Adkins v. Facebook, Inc.*, No. 18-cv-05982-WHA, dkts. 350, 369 (N.D. Cal. May 6, 2021 and July 13, 2021) (approving settlement for injunctive relief only, in class action arising out of Facebook data breach, and granting $6.5 million in attorneys' fees and costs).

The per-person relief here is in line with—and in most instances—exceeds the relief secured in other large BIPA settlements. *Rosenbach v. Six Flags Ent. Corp.*, 2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) (approving reversionary $36 million fund for approximately 1,110,000 class members, which caps class member payments at $200 or $60 depending on date of finger scan and provides that defendant retains all unclaimed funds); *Boone*, 2022-LA-000708 ($35 million fund for approximately 3.8 million class members); *Kusinski*, 2017-CH-12364 ($25 million fund for approximately 320,000 class members); *Prelipceanu*, 2018-CH-15883 ($7 million fund for approximately 260,000 class members); *Miracle-Pond*, 2019-CH-07050 ($6.75 million fund for potentially millions[6] of class members); *Thome v. Novatime Tech., Inc.*, No. 19-

---

[6]  The settlement papers submitted in *Miracle-Pond* represented that there were approximately 954,000 class members, but that number only counted Shutterfly *users* in Illinois; it did not include the vast number of *non-users* who appeared in users' photographs uploaded to Shutterfly and who were included in the settlement class definition.

cv-6256, dkt. 90 (N.D. Ill. Mar. 8, 2021) ($4.1 million fund for approximately 62,000 class

members, and assignment of insurance policy); *Bryant v. Compass Grp. USA, Inc.*, No. 19-cv-

06622, dkt. 125 (N.D. Ill. Sept. 8, 2022) (approving $6.8 million settlement for 66,159 class

members, which releases both the vendor of the biometric technology and all of its customers).

    This result is even more impressive when considering that the Settlement's release

preserves class member's separate BIPA claims against Onfido's customers who subjected them

to biometric identity verification without complying with BIPA themselves. (Agreement § 1.33

(the Released Parties "shall not include Defendant's customers").) That means each class

member will retain any separate BIPA claims they have against Onfido customers who did not

comply with BIPA. This is significant because scores of prior BIPA settlements released both the

customer claims and the vendor claims together, with no additional compensation for the release

of two sets of claims. This carve-out enables class members to vitiate the full scope of their

privacy rights under BIPA, rather than, as in other cases, forcing class members to make a choice

about which violations to pursue.

    Finally, aside from the monetary relief, the non-monetary benefits created by the

Settlement further support the requested fee award. Per the Settlement Agreement, Onfido will

provide its customers who have Illinois users a model informed written consent form, instruct

those customers to use Onfido's latest SDK which ensures that written consent is given or use

equivalent language before identity verification is performed, and requires such customers to

confirm annually for the next two years that they are complying with BIPA. (Agreement § 2.4.)

The deal also requires Onfido to establish a retention and deletion schedule for end users'

biometric data with which Onfido must comply. (*Id.*) This non-monetary result is also properly

considered for purposes of determining fees. *See Hall v. Cole*, 412 U.S. 1, 5 n.7 (1973).

Ultimately, the monetary and non-monetary relief recovered on behalf of the Settlement Classes warrants approving the requested 33% of the monetary benefits of the Net NFI Class Settlement Fund and Net FI Class Settlement Fund as attorneys' fees.

## IV. THE COURT SHOULD APPROVE THE REQUESTED INCENTIVE AWARDS.

The Settlement Agreement also provides for incentive awards of $5,000.00 to each of the named Plaintiffs, Fredy Sosa and Rohith Amruthur, for serving as class representatives, to be paid from the NFI Class Settlement Fund and FI Class Settlement Fund, respectfully. Incentive awards are appropriate in class actions to compensate individuals for stepping up to protect the interests of a broader class and spending their own time to achieve benefits for the class as a whole. *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

Here, Mr. Sosa and Mr. Amruthur served the Settlement Classes in different (but important) ways, and their participation was critical to the case's ultimate resolution. (Ufkes Decl. ¶ 15.) Mr. Sosa has been actively involved in the case since day one, as he initiated this case against Onfido, took it up to the Seventh Circuit, and eventually helped secure a resolution for the NFI Class. (*Id.* ¶ 16.) Mr. Amruthur became actively involved in the litigation after informal discovery revealed that a significant portion of the putative class used financial-related apps when their identities were verified by Onfido, and when Class Counsel realized a second class representative was needed to represent the interests of this segment of the class. Mr. Amruthur—a user of one of Onfido's customers financial-related apps—willingly stepped up to represent the FI Class as the lead plaintiff at a crucial juncture in the case. (*Id.* ¶ 17.) Had he not done so, the relief secured for the FI Class wouldn't have been possible.

Both Mr. Sosa's and Mr. Amruthur's willingness to commit time to this litigation and undertake the responsibilities involved in representative litigation resulted in a substantial benefit

to the Settlement Classes and fully justifies the requested incentive awards. Throughout the case, they expended time and effort regularly conferring with Class Counsel, providing information to Class Counsel to prepare the pleadings, reviewing the complaint and/or amended complaint before filing, and reviewing and approving the Settlement Agreement before signing it. (Ufkes Decl. ¶¶ 16, 17.) As a direct result of Plaintiffs' participation, Class Counsel was able to secure substantial monetary relief for the Settlement Classes, which is readily available for class members to take advantage of, as evidenced by the tens of thousands of claims already submitted, and fully justifies the requested incentive awards. (*Id.* ¶ 18.) Plaintiffs were also willing to attach their names to this litigation against Onfido and allow it to be transmitted via class notice to over 600,000 people, subjecting themselves to "scrutiny and attention" which is "certainly worth some remuneration." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 601 (N.D. Ill. 2011).

As a monetary matter, Plaintiffs' requested incentive awards are eminently reasonable: they're in line with the amounts awarded to plaintiffs in numerous other privacy cases, including BIPA cases, (*See* Exhibit 3, Chart 3), and a fraction of the amounts often awarded in BIPA class settlements in this District and in other class settlements by this Court. (*See* Exhibit 3, Chart 3 (listing incentive awards in BIPA cases in this District of $5,000, $7,500, and $10,000).) Accordingly, Plaintiffs' incentive awards should be granted.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order (1) granting Class Counsel's request for an award of attorneys' fees and expenses in the amount of $5,015,651.55 from the NFI Class Settlement Fund and $3,870,202.68 from the FI Class Settlement Fund; (2) awarding Plaintiff Sosa a $5,000.00 incentive award from the NFI Class

Settlement Fund and awarding Plaintiff Amruthur a $5,000.00 incentive award from the FI Class

Settlement Fund; and (3) providing such other and further relief as the Court deems reasonable

and just.

Respectfully submitted,

**FREDY SOSA** and **ROHITH AMRUTHUR**,
individually and on behalf of all others similarly
situated,

Dated: September 15, 2023          By: /s/ Schuyler Ufkes
                                       One of Plaintiffs' Attorneys

J. Eli Wade-Scott
ewadescott@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378