# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| FREDY SOSA and ROHITH AMRUTHUR, individually and on behalf of all others similarly situated,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>ONFIDO, INC., a Delaware corporation,<br><br>     *Defendant*. | Case No.: 20-cv-04247<br><br>Honorable Marvin E. Aspen |

## PLAINTIFFS' MOTION FOR AND MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF A CLASS ACTION SETTLEMENT

## TABLE OF CONTENTS

Page

I.   INTRODUCTION.................................................................................................1

II.  BACKGROUND ..................................................................................................3

    A.   The Claims ...............................................................................................3

    B.   Procedural History ...................................................................................4

III. TERMS OF THE SETTLEMENT AGREEMENT ..........................................5

    A.   Definitions of the Settlement Classes..................................................... 5

    B.   Monetary Relief .......................................................................................6

    C.   Prospective Relief ....................................................................................7

    D.   Payment of Settlement Notice and Administrative Costs.......................7

    E.   Attorneys' Fees and Incentive Awards ...................................................8

    F.   Release ......................................................................................................8

IV.  THE CLASS NOTICE FULLY SATISFIED DUE PROCESS .......................9

V.   CERTIFICATION OF THE SETTLEMENT CLASSES SHOULD BE
    CONFIRMED FOR PURPOSES OF FINAL APPROVAL ...........................11

VI.  THE SETTLEMENT WARRANTS FINAL APPROVAL.............................11

    A.   Plaintiffs and Class Counsel have Adequately Represented the Classes ........12

    B.   The Settlement Is the Product of Arm's-Length, Non-Collusive
    Negotiations ...........................................................................................14

    C.   The Settlement Treats Class Members Equitably ...........................................15

    D.   The Relief Secured for the Settlement Class is Adequate and Warrants Final
    Approval .................................................................................................17

        1.   *The Relief Provided by the Settlement is Excellent* .................................18

        2.   *The Cost, Risk, and Delay of Further Litigation Compared to the
        Settlement's Benefits Favors Final Approval* ...........................................21*

3.  *The Method of Distributing Relief to the Class Members is Effective and Supports Final Approval* ...........................................................................23

4.  *The Terms of the Requested Attorneys' Fees are Reasonable.* ...............25

E.  **The Remaining Considerations Set Forth by the Seventh Circuit Support Approval of the Settlement** ...............................................................................26

1.  *The Reaction of the Settlement Class Favors Approval* ...........................26

2.  *Experienced Counsel's Belief that the Settlement is Beneficial to the Class Weighs in Favor of Final Approval* ...........................................................31

3.  *The Settlement Raises No Red Flags* ........................................................32

VII.  **CONCLUSION** ...................................................................................................33

## **TABLE OF AUTHORITIES**

**Page(s)**

**United States Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974)........................................................................................................9

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999)......................................................................................................17

**United States Circuit Court of Appeals Cases**

*Eubank v. Pella Corp.,*
    753 F.3d 718 (7th Cir. 2014) ................................................................................ 26, 32

*Golan v. FreeEats.com, Inc.,*
    930 F.3d 950 (8th Cir. 2019) ......................................................................................22

*Murray v. Grocery Delivery E-Servs. USA Inc.,*
    55 F.4th 340 (1st Cir. 2022)..........................................................................15, 16, 17

*Patel v. Facebook, Inc.,*
    932 F.3d 1264 (9th Cir. 2019) ....................................................................................22

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) .................................................................................11, 31

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014) ......................................................................................11

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) ......................................................................................12

*Wakefield v. ViSalus, Inc.,*
    51 F.4th 1109 (9th Cir. 2022) .....................................................................................22

*Wong v. Accretive Health, Inc.,*
    773 F.3d 859 (7th Cir. 2014) .............................................................................. *passim*

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.,*
    309 F.3d 978 (7th Cir. 2002) ......................................................................................11

*United States v. Dish Network L.L.C.,*
    954 F.3d 970 (7th Cir. 2020) .................................................................................22, 23

## United States District Court Cases

*Alvarado v. Int'l Laser Prods., Inc.*,
    No. 18-cv-7756 (N.D. Ill.) ............................................................................25

*Bryant v. Compass Group USA, Inc.*,
    No. 19-cv-06622 (N.D. Ill.) .........................................................................20

*Chambers v. Together Credit Union*,
    No. 19-CV-00842-SPM, 2021 WL 1948453 (S.D. Ill. May 14, 2021) ...........................13

*Charvat v. Valente*,
    No. 12-CV-05746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019) .....................................31

*Crumpton v. Haemonetics Corporation*,
    1:21-cv-01402 (N.D. Ill.) .............................................................................20

*Crumpton v. Octapharma Plasma, Inc.*,
    19-cv-08402 (N.D. Ill.) ........................................................................20, 25, 27

*Davis v. Jumio Corp.*,
    No. 22-CV-00776, 2023 WL 2019048 (N.D. Ill. Feb. 14, 2023) .....................................16

*Follansbee v. Discover Fin. Servs., Inc.*,
    No. 99 C 3827, 2000 WL 804690 (N.D. Ill. June 21, 2000) ............................................16

*Goldsmith v. Tech. Sols. Co.*,
    No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995).........................................21

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ..................................................................9, 18, 23, 28

*In re Capital One Telephone Consumer Protection Act Litig.*,
    80 F.Supp.3d 781 (N.D. Ill. 2015) .................................................................27

*In re Facebook Biometric Info. Priv. Litig.*,
    No. 3:15-CV-03747-JD, 2018 WL 2197546 (N.D. Cal. May 14, 2018) ..........................21

*In re Facebook Biometric Info. Priv. Litig.*,
    522 F. Supp. 3d 617 (N.D. Cal. 2021) ............................................................27

*In re Google Plus Profile Litigation*,
    No. 5:18-cv-6164-EJD, 2021 WL 242887 (N.D. Cal. Jan. 25, 2021) .........................29, 30

*In re Google LLC St. View Elec. Commc'ns Litig.*,
    611 F.Supp.3d 872 (N.D. Cal. 2020) ...............................................................18, 19

*In re Mexico Money Transfer Litig. (W. Union & Valuta)*,
164 F. Supp. 2d 1002 (N.D. Ill. 2000) ...................................................29

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
332 F.R.D. 202 (N.D. Ill. 2019)...............................................................12, 29

*In re Sw. Airlines Voucher Litig.*,
No. 11 C 8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013)........................27

*In re TikTok, Inc., Consumer Priv. Litig.*,
617 F. Supp. 3d 904 (N.D. Ill. 2022) .....................................................25

*Low v. Trump Univ., LLC*,
246 F. Supp. 3d 1295 (S.D. Cal. 2017)....................................................28

*Mangone v. First USA Bank*,
206 F.R.D. 222 (S.D. Ill. 2001) .............................................................30

*McGoveran v. Amazon Web Servs., Inc.*,
No. 20-1399-LPS, 2021 WL 4502089 (D. Del. Sept. 30, 2021) .....................22

*Moore v. Verizon Commc'ns Inc.*,
No. C 09-1823 SBA, 2013 WL 4610764 (N.D. Cal. Aug. 28, 2013)................29

*Neals v. ParTech, Inc.*,
No. 19-cv-05660 (N.D. Ill.) ...............................................................25, 26

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
No. 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) .........................31

*Rogers v. BNSF Ry. Co.*,
No. 19 C 3083, 2023 WL 4297654 (N.D. Ill. June 30, 2023) ........................23

*Schulte v. Fifth Third Bank*,
No. 09-CV-6655, 2010 WL 8816289 (N.D. Ill. Sept. 10, 2010) .....................15

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ...............................................9, 21, 29, 31

*Snyder v. Ocwen Loan Servicing, LLC*,
No. 14 c 8461, 2018 WL 4659274 (N.D. Ill. Sept. 28, 2018)........................12, 13

*Snyder v. Ocwen Loan Servicing, LLC*,
No. 14 c 8461, 2019 WL 2103379 (N.D. Ill. May 14, 2019) .........................12, 15

*Thome v. NOVAtime Tech., Inc.*,
    No. 19-cv-6256 (N.D. Ill.) ..........................................................................20, 27

*T.K. v. Bytedance Tech. Co., Ltd.*,
    No. 19-CV-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022).........................................28

*Vaughan v. Biomat USA, Inc.*,
    20-cv-04241 (N.D. Ill.) ...........................................................................................25

**State Supreme Court Cases**

*Cothron v. White Castle System, Inc.*,
    2023 IL 128004...........................................................................................................23

**State Circuit Court Cases**

*Boone v. Snap, Inc.*,
    2022-LA-000708 (Cir. Ct. Dupage Cnty.) .........................................................19

*Carroll v. Crème de la Crème, Inc.*,
    2017-CH-01624 (Cir. Ct. Cook Cnty.) .............................................................19

*Kusinski v. ADP, LLC*,
    2017-CH-12364 (Cir. Ct. Cook Cnty.) ......................................................19, 27

*Lark v. McDonald's USA, LLC*,
    No. 17-L-559 (Cir. Ct. St. Clair Cnty.) ...........................................................19

*Miracle-Pond v. Shutterfly, Inc.*,
    2019-CH-07050 (Cir. Ct. Cook Cnty.) ......................................................19, 20

*Prelipceanu v. Jumio Corp.*,
    2018-CH-15883 (Cir. Ct. Cook Cnty.) ......................................................19, 27

*Rosenbach v. Six Flags Ent. Corp.*,
    2016-CH-00013 (Cir. Ct. Lake Cnty.) .............................................................19

*Sekura v. L.A. Tan Enters., Inc.*,
    2015-CH-16694 (Cir. Ct. Cook Cnty.) .............................................................27

**Statutes**

Fed. R. Civ. P. 23 ................................................................................. *passim*

740 ILCS 14/1 .............................................................................1, 3, 4, 16

## **Miscellaneous Authority**

*Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*,
    FED. TRADE COMM'N, 11 (Sept. 2019) .............................................................................27

FEDERAL JUDICIAL CENTER,
    *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*
    (2010)..............................................................................................................................9

PRINCIPLES OF THE L. OF AGGREGATE LITIG. (Am. L. Inst. 2010) .................................................15

Rossman et al., *Consumer Class Actions: A Practical Litigation Guide* (2023) ....................30, 31

4 NEWBERG ON CLASS ACTIONS (6th ed. 2023) .............................................................................23

## I.   INTRODUCTION

In 2020, Plaintiff Freddy Sosa brought this class action against Defendant Onfido, Inc. ("Defendant" or "Onfido"), a vendor of identity verification software for smartphone applications and websites. He alleged that Onfido unlawfully collected the facial geometry of hundreds of thousands of Illinois residents without informed consent, in violation of the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq*.[1] After two years of hotly contested litigation—during which Plaintiff defeated Onfido's attempts to compel arbitration in both this Court and the Seventh Circuit, survived a 12(b)(6) motion to dismiss, and undertook formal and informal discovery—the Parties engaged in months of negotiations to craft the uniquely structured Settlement Agreement that is now before the Court for final approval. Ultimately, Plaintiffs secured two settlement funds totaling $28.5 million for the Settlement Classes, while equitably distinguishing between class members subject to different defenses and maintaining the long-term solvency of Onfido. That relief is exceptional, and warrants final approval as "fair, reasonable, and adequate" under Rule 23. *See* Fed. R. Civ. P. 23(e)(2).

Two distinctive features of the Settlement made a class-wide resolution possible. First, the Agreement creates two settlement classes to account for a defense specific to a subset of class members—those whose information was collected via Onfido customers providing financial services such that they may be subject to BIPA's exemption for "financial institution[s]" and their "affiliates." *See* 740 ILCS 14/25(c). Plaintiff Rohith Amruthur stepped forward to represent the Financial Institution Class ("FI Class"), composed of approximately 410,418 users of financial services apps, and Mr. Sosa remains the class representative for the Non-Financial Institution Class

---

[1] Capitalized terms used in this Motion are those used in the Amended Class Action Settlement Agreement ("Settlement" or "Agreement") attached hereto as Exhibit 1.

("NFI Class"), composed of approximately 199,012 users of non-financial services apps. Second, given Onfido's demonstrated financial limitations, the Settlement allows Onfido to pay into the settlement funds for both Settlement Classes on a rolling basis over the next three years. Rather than settling for a reduced single payment now, class members will receive greater compensation over a longer term.

Under this payment plan, Defendant will deposit a total of $12.8 million in a non-reversionary settlement fund for the FI Class, and $15.7 million in a non-reversionary settlement fund for NFI Class, if the Settlement is approved. Given the exceptional final claims rates of 18.3% for the NFI Class and 20.1% FI Class, each NFI Class Member with an approved claim will receive $279, and each FI Class Member with an approved claim will receive $95, after fees and costs are deducted. The Settlement also secures robust prospective relief for both classes. Defendant has promised to create and abide by a BIPA-compliant data retention policy, to incorporate a consent form into the software development kit, or SDK, it provides to app and website developers, and to confirm annually that its customers obtain the informed consent BIPA requires. Finally, the Settlement preserves all class members' BIPA claims against Onfido's customers.

In accordance with the Court's preliminary order (Dkt. 73), the Settlement Administrator carried out a successful notice program that reached 96.8% of the NFI Class list and 99.3% of the FI Class list. Of the 199,012 NFI Class members, only 6 opted out and no one objected. Of the 410,418 FI Class members, only 18 opted out and just one objected. On the other hand, 36,479 NFI Class Members and 82,538 FI Class Members submitted approved claims for payment. The warm response comes as no surprise. The Settlement's substantial monetary relief, coupled with its narrow release and meaningful limits on Defendant's future data collection, outshines nearly all comparable BIPA settlements with software vendors like Onfido. For the reasons described

2

below, the Court should confirm the certification of both Settlement Classes and grant final approval on the Settlement.

## II.     BACKGROUND

### A.     The Claims

Defendant Onfido sells biometric software that businesses can embed in smartphone applications and websites to verify the identities of their users. (First Amended Complaint ("FAC") ¶ 1-3.) Onfido's customers often ask their users to establish their identities by submitting a photo ID along with a photo of the user's face. (*Id.* ¶ 24.) Plaintiffs allege that Onfido's software extracts biometric data from these images and stores that information in a database called "Known Faces." (*Id.* ¶ 29.) Because Onfido's technology is designed to seamlessly integrate with its customers' applications, Plaintiffs claim that most end users never become aware of Onfido's involvement or even learn that their biometric identifiers have been collected at all. (*Id.* ¶¶ 3, 28.) Plaintiff Freddy Sosa verified his identity to use a consumer-to-consumer marketplace app called OfferUp. (*Id.* ¶ 37.) Plaintiff Rohith Amruthur verified his identity to use a financial services app. (*Id.* ¶ 44.) Both allege that Onfido extracted biometric identifiers from images of their faces, stored that data, and used it to identify them. (*Id.* ¶¶ 37, 44.) Plaintiffs claim that Onfido did not obtain their informed written consent for this collection, in violation of Section 15(b) of BIPA. (*Id.* ¶¶ 59-61). They further allege that Defendant violated Section 15(a) of BIPA by failing to maintain and comply with a publicly available policy governing the retention and destruction of biometric identifiers. (*Id.*) BIPA allows for the recovery of statutory damages in the amount of $1,000 for negligent violations—or $5,000 for willful violations—plus costs and reasonable attorneys' fees. *See* 740 ILCS 14/20. Defendant denies that it has engaged in any wrongdoing.

3

### B.     Procedural History

Plaintiff Sosa filed suit against Onfido in Cook County in June 2020, and Defendant removed to this Court. (Dkt. 1.) Onfido then sought to compel arbitration, citing an arbitration provision in the terms of service for OfferUp—the app through which Mr. Sosa encountered Onfido's software. (Dkt. 21.) This Court denied Defendant's motion to compel arbitration (Dkt. 31), holding that Onfido was not a party to the contract and could not enforce that clause. The Seventh Circuit affirmed that decision after full briefing and oral argument. *Sosa v. Onfido, Inc.*, 8 F.4th 631 (7th Cir. 2021). On remand, Onfido moved to dismiss for failure to state a claim, arguing that its software fell under a BIPA exemption for "information derived from" photographs, that Plaintiff failed to plead that Onfido acted with a culpable state of mind, and that application of BIPA to Defendant's conduct would violate the First Amendment. (Dkt. 46.) While this motion was pending, the Court also ordered the parties to address whether Plaintiff had Article III standing for his claim under Section 15(a) of BIPA. (Dkt. 52.) After all issues had been fully briefed, the Court issued an opinion finding standing for both BIPA claims and denying Onfido's 12(b)(6) motion in its entirety on April 25, 2022. (Dkt. 58.)

Onfido then answered (Dkt. 59) and the parties began discovery (Dkt. 62). After initial disclosures, a first round of interrogatories and requests for production, and significant informal discovery about the size and composition of the class, Class Counsel learned that Onfido provides biometric identity services to a variety of client apps. (Declaration of Schuyler Ufkes, attached hereto as Exhibit 2 ("Ufkes Decl.") ¶¶ 3-4.) Specifically, many Onfido clients operate in the financial sector, which permitted Onfido to argue it had an exemption as an "affiliate" of a "financial institution" with respect to users of financial-related apps. *See* 740 ILCS 14/25(c). To achieve a global resolution, the parties determined that it would be necessary to create two separate

classes of consumers whose data was processed by Onfido—one for users of financial services apps, and one for all other users. (Ufkes Decl. ¶ 5.) An additional class representative, Rohith Amruthur, agreed to protect the interests of those class members whose biometric information had been collected from Onfido through a financial services app. (*Id.*)

The parties also initiated settlement discussions. Class Counsel reviewed Onfido's financial statements, and negotiated in light of Defendant's financial limitations. (Ufkes Decl. ¶ 4.) After eight months of informal discovery and negotiation, the Parties executed a written settlement agreement and moved for preliminary approval on March 13, 2023. (*Id.* ¶ 7.) The Court then requested additional information and suggested various amendments to the settlement terms, (Dkt. 68), many of which the Parties implemented in an Amended Settlement Agreement (Dkt. 71). (Ufkes Decl. ¶ 7.) The Court preliminarily approved the Amended Settlement Agreement on May 5, 2023. (Dkt. 73.) Most recently, Plaintiffs and Class Counsel moved for an award of attorney's fees, expenses, and Plaintiffs' incentive awards on September 18, 2023 to be considered along with the instant motion at the final approval hearing. (Dkt. 81.)

## III. TERMS OF THE SETTLEMENT AGREEMENT

The full Amended Settlement Agreement is attached as Exhibit 1. For the Court's convenience, its terms are briefly summarized here:

### A. Definitions of the Settlement Classes

The Court certified two separate classes for settlement purposes. (Dkt. 73.) The Financial Institution Class ("FI Class") includes "[a]ll persons who, while within the State of Illinois, uploaded a photo or video of [them]self and a photo ID to any application, software, or website operated by a Financial Institution Customer, and subsequently to Onfido, between June 12, 2015 and May 5, 2023." (Dkt. 73.) A "Financial Institution Customer" means any Onfido customer

engaged in "(a) lending, exchanging, transferring, investing for others, or safeguarding money or securities; (b) providing insurance; (c) providing financial, investment, or economic advisory services; or (d) underwriting, dealing in, or making a market in securities." (Agreement § 1.16) The Non-Financial Institution Class ("NFI Class") includes "[a]ll persons who, while within the State of Illinois, uploaded a photo or video of [them]self and a photo ID to any application, software, or website operated by a Non-Financial Institution Customer, and subsequently to Onfido, between June 12, 2015 and May 5, 2023." (Dkt. 73.) The Court excluded from both classes (1) persons who executed a written release or consent form specifically Onfido as being authorized to collect or store their alleged biometric data, before their alleged biometric data was ever collected or stored by Onfido, (2) any Judge or Magistrate presiding over this action and members of their families, (3) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, (4) persons who properly execute and file a timely request for exclusion, and (5) the legal representatives, successors or assigns of any such excluded person. (*Id.*)

### B. Monetary Relief

The Agreement establishes a $15,714,404.10 fund for the NFI Class, and a $12,785,595.90 fund for the FI Class. (Agreement §§ 1.20, 1.26.) Each class member who submits a valid claim will receive a *pro rata* share of their respective class fund, after deductions for Court-approved fees and costs. (*Id.* §§ 1.21, 1.27.) Class members can choose to receive their money via check or electronic payment (Venmo, Zelle, or PayPal). (*Id.* § 1.6.) No amount of either fund will revert to Defendant. (*Id.* §§ 1.20, 1.26.) Given that 36,479 members of the NFI Class (about 18.3%) have submitted a valid claim and 82,538 members of the FI Class (about 20.1%) have submitted a valid

claim, each NFI Class Member will receive about $279 and each FI Class Member will receive about $95.

These settlement payments will be distributed to class members in multiple installments, because Defendant's financial limitations require it to fund the Settlement on a rolling basis. Class members who request electronic payments will receive their share in four installments over three years. (*Id.*§ 2.1(c), Ex. A.) Those who request payment by check in the mail will receive two checks over three years, to limit the administrative expenses of printing and sending multiple paper checks. (*Id.* § 2.1(d), Ex. A). Any person who belongs to both classes will be paid entirely from the fund created for the Non-Financial Institution Class. (*Id.* § 2.2.)

### C. Prospective Relief

Defendant has promised to instruct all customers that have Illinois users to obtain informed written consent on Onfido's behalf, including by instructing them to use the latest version of Onfido's software development kit ("SDK"), which contains a written consent form. (*Id.* § 2.4(a)(i).) For the next two years, Defendant will require all customers with users that reside in Illinois to confirm annually that they are either using Onfido's consent form, or otherwise complying with BIPA. (*Id.*) Onfido has also agreed to develop and comply with an appropriate policy for the retention and destruction of biometric data, which is publicly available on its website.[2] (*Id.* § 2.4(a)(ii).)

### D. Payment of Settlement Notice and Administrative Costs

Defendant agreed to pay from the Settlement Fund all expenses incurred by the Settlement Administrator in, or associated with, administering the Settlement, providing Notice, creating and

---

[2]      *Onfido Facial Scan and Voice Recording Policy*, ONFIDO, last updated May 16, 2023, https://onfido.com/facial-scan-policy-and-release.

maintaining the Settlement Website, receiving and processing Claim Forms, disbursing settlement payments by mail and electronic means, and any other related expenses. (*Id.* § 8.1.)

### E. Attorneys' Fees and Incentive Awards

Defendant has agreed to pay reasonable attorneys' fees in an amount determined by the Court, to be paid from the NFI Class Settlement Fund and FI Class Settlement Fund. (*Id.* § 8.1.) Class Counsel voluntarily agreed to limit their request to 33% of each fund (*id.*), which they made by a separate motion on September 18, 2023. (Dkt. 81.) Defendant has also agreed to pay Plaintiffs' incentive awards from each respective fund in the amount of $5,000 each, subject to Court approval, in recognition of their efforts in serving as Class Representatives. (Agreement § 8.2-8.3.)

### F. Release

As described in Plaintiffs' supplemental motion for preliminary approval, the Parties took several of the Court's suggestions in narrowing the Released Claims. (*See* Dkts. 68, 69.) As a result, in return for the relief described above, class members will release Onfido and its related companies from all known and unknown claims "arising from or relating to Onfido's alleged collection, possession, capture, purchase, receipt through trade, obtaining, sale, profit from, disclosure, redisclosure, dissemination, storage, transmittal, and/or protection from disclosure of (1) alleged scans of a face, scans of a retina or iris, and/or voiceprints derived from a photo or video submitted to Onfido and/or Released Parties and/or (2) any alleged biometric information, regardless of how it is captured, converted, stored, or shared, based on an individual's scan of a face, scan of a retina or iris, and/or voiceprint derived from the same photo or video, used to identify the individual…" (*Id.* §§ 1.32-1.34, 3.1). However, the Agreement preserves class members' claims against Onfido's customers, who are explicitly excluded from the Release. (*Id.* § 1.33.)

8

## IV.     THE CLASS NOTICE FULLY SATISFIED DUE PROCESS

Prior to granting final approval, courts must consider whether the class members received "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011) ("*Schulte I*"). Not every class member needs to receive actual notice to satisfy Rule 23 and due process; rather, the notice program need only be "reasonably calculated" to reach the interested parties. *See In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 968 (N.D. Ill. 2011) (collecting cases). In general, a notice plan that reaches at least 70% of class members is considered reasonable. *See* FEDERAL JUDICIAL CENTER, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* 3 (2010), available at www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

Here, the Court-approved Notice plan called for (1) direct notice via email and First-Class U.S. Mail to all persons in the Settlement Class for whom a valid email address and/or mailing address was available, (2) the creation of a detailed Settlement Website, (3) targeted ads, and (4) reminder notices via email. (Agreement § 4.3.) First, the Parties were able to obtain at least one form of contact information (address and/or email) for 195,286 individuals in the NFI Class (or 98.1% of the NFI Class list) and 408,416 individuals in the FI Class (or 99.5% of the FI Class list). (Declaration of Jacob Kamenir, attached hereto as Exhibit 3 ("Kamenir Decl.") ¶¶ 7-8.) Before sending direct notice, the Settlement Administrator updated the U.S. Mail addresses on the Class List through the National Change of Address database to ensure the most up-to-date addresses as possible. (*Id.* ¶ 9.) On August 4, 2023, the Settlement Administrator sent the Court-approved direct notice via U.S. Mail and email to all addresses and email addresses on the NFI Class list and FI

Class list. (*Id.* ¶¶ 15, 17.) Ultimately, for the NFI Class, at least one form of direct notice (via U.S. Mail, email, or both) successfully reached 192,714 NFI Class members, or 96.8% of the NFI Class list. (*Id.* ¶ 23.) For the FI Class, at least one form of direct notice (via U.S. Mail, email, or both) successfully reached 407,554 FI Class members, or 99.3% of the FI Class list. (*Id.* ¶ 20.)

To reach class members with no contact information available, the Settlement Administrator designed and placed targeted ads via Facebook and Google. (*Id.* ¶ 24.) The ads provided a direct link to the Settlement Website, where class could review information about the case, the Settlement, and submit a claim online. In total, these advertisements delivered 4,411,951 gross impressions, and resulted in 66,847 clicks through to the Settlement Website. (*Id.* ¶ 25.)

The Settlement Administrator also sent two rounds of reminder notices via email to class members who, at each point, had not yet submitted a claim. (*Id.* ¶¶ 26-27.) The first reminders were sent on September 6, 2023 (30 days before the Claims Deadline) to 63,350 NFI Class members and to 327,313 FI Class members. The second reminders were sent on September 29, 2023 (7 days before the Claims Deadline) to 60,727 NFI Class members and to 311,343 FI Class members (*Id.*)

Both the direct notices and reminder notices directed class members to the Settlement Website, www.OnfidoBIPASettlement.com, which has been and continues to be available 24/7 and features the "long form" Internet notice and important court filings (including Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards), important deadlines, and answers to frequently asked questions. (*Id.* ¶ 8; Agreement § 4.3(d); Ex. G.)

Overall, the Notice program was highly successful. Direct Notice reached around 96.8% of the NFI Class list and 99.3% of the FI Class list, those notices were supplemented with two rounds of reminder notices, and (as further discussed below) the Parties ultimately achieved an

10

outstanding claims rates of 18.3% for the NFI Class and 20.1% for the FI Class. Those procedures easily satisfy both Rule 23 and due process.

## V.    CERTIFICATION OF THE SETTLEMENT CLASSES SHOULD BE CONFIRMED FOR PURPOSES OF FINAL APPROVAL

At preliminary approval, the Court certified both the FI Class and NFI Class for settlement purposes under Rule 23. The Court held that both Settlement Classes are sufficiently numerous, that common questions predominate within each class, that the named Plaintiffs' claims are typical of their respective classes, that Plaintiffs and Class Counsel will adequately represent the two classes, and that a class action is a superior method for fairly and efficiently adjudicating this matter. (Dkt. 69; Dkt. 73.) Since nothing has changed since then, the Court should confirm certification of the Settlement Classes for purposes of entering a Final Approval Order.

## VI.    THE SETTLEMENT WARRANTS FINAL APPROVAL

When analyzing class action settlements, "the law quite rightly requires more than a judicial rubber stamp[.]" *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). To that end, the Seventh Circuit has established "the district judge as a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotations omitted).

Federal Rule of Civil Procedure 23(e) governs court approval of class action settlements and mandates that class action claims may only be settled with court approval, "after a hearing and only on finding that it is fair, reasonable, and adequate[.]" Fed. R. Civ. P. 23(e); *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002). Rule 23(e)(2) requires a court to consider whether (1) the class representative and class counsel have adequately represented the class; (2) the settlement was negotiated at arm's length; (3) the settlement treats class members equitably relative to each other; and (4) the relief provided for the class is adequate.

11

Fed. R. Civ. P. 23(e)(2); *see, e.g.*, *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 c 8461, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019).

Because "each circuit has developed its own vocabulary for expressing these concerns[,]" the Court should also take into account the factors set out by the Seventh Circuit. Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 Amendment. These factors are: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (internal quotations omitted); *accord Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006). Courts in the Seventh Circuit continue to analyze these factors in tandem with the Rule 23(e)(2) guidelines to ensure that a settlement is fair, reasonable, and adequate. *See, e.g.*, *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 217 (N.D. Ill. 2019).

Under the Rule 23(e)(2) factors and the corresponding considerations used by the Seventh Circuit, this Settlement deserves final approval as it is fair, reasonable, and adequate.

## A. Plaintiffs and Class Counsel have Adequately Represented the Classes

The first Rule 23(e)(2) factor—whether the class representative and class counsel have adequately represented the class—focuses on class counsel's and the class representatives' performance as it relates to the "conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e), Advisory Committee's Note to 2018 Amendment. This factor is generally satisfied where the named plaintiffs participated diligently, and class counsel zealously litigated the case. *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 c 8461, 2018

WL 4659274, at *3 (N.D. Ill. Sept. 28, 2018); *see also Chambers v. Together Credit Union*, No. 19-CV-00842-SPM, 2021 WL 1948453, at *2 (S.D. Ill. May 14, 2021) (finding this factor satisfied when class counsel vigorously litigated the case "both through motion practice on the legal merits and through discovery of facts and potential damages"). In considering this factor, courts examine whether the plaintiff and class counsel had adequate information to negotiate a class-wide settlement, taking into account the nature and amount of discovery completed. *See Snyder*, 2018 WL 4659274 at *4. This inquiry is coextensive with the Seventh Circuit's direction to consider the "stage of the proceedings and the amount of discovery completed." *Wong*, 773 F.3d at 863 (internal quotations omitted).

Mr. Sosa and Mr. Amruthur have continued to diligently represent both classes since preliminary approval. (*See* Dkt. 67.) As discussed further below, the use of two named Plaintiffs to represent users of financial and non-financial applications aligned the incentives of the class representatives with the full range of consumers whose biometric information was collected by Onfido. Without the named Plaintiffs stepping up to represent each class, reviewing the pleadings and Settlement Agreement, and otherwise staying involved in nearly every aspect of the case, it would have been impossible to secure relief from Defendant. Given their efforts—and the outcome they have achieved for their fellow class members—there can be no doubt that Mr. Sosa and Mr. Amruthur have adequately represented the two settlement classes.

Similarly, Class Counsel worked vigorously to protect the interests of both classes throughout this case, as detailed in Plaintiffs' motion for attorney fees and expenses (Dkt. 81, at 6-10). Guided by ample experience in complex class action litigation, including BIPA cases, Class Counsel defeated Defendant's efforts to compel arbitration, both in this Court and the Seventh Circuit, and defeated Defendant's Rule 12(b)(6) motion. Those victories permitted discovery to

begin, and gave Plaintiffs leverage in negotiations for settlement discussions. When informal discovery revealed the range of applications that used Onfido, Class Counsel devised a two-class solution to protect the interests of all class members. Then, Class Counsel carefully vetted Defendant's claims of financial strain, and crafted a Settlement that provides outstanding cash relief to the class—which stacks up favorably against similarly sized BIPA settlements, as explained below—while preserving Onfido's viability as an enterprise. Even after preliminary approval, Class Counsel worked to obtain contact information for additional class members, issuing subpoenas to three Onfido customers who refused to provide contact information.

In sum, Plaintiffs' and Class Counsel's performance throughout the investigation, discovery, motion practice, appeal, and settlement negotiations in the case easily satisfies the adequate representation requirement.

### B. The Settlement Is the Product of Arm's-Length, Non-Collusive Negotiations

The next factor requires the court to consider whether the proposed settlement is the result of arm's-length negotiations. *See Wong*, 773 F.3d at 864. The record here demonstrates nothing but good-faith, non-collusive bargaining between the Parties. Two years of hard-fought litigation preceded settlement negotiations. As discussed above, Class Counsel defeated Defendant's motion to compel arbitration and defended this Court's ruling on immediate appeal in the Seventh Circuit. Only in the summer of 2022—after the case returned to this Court and Defendant lost its bid to dismiss the case on a 12(b)(6) motion—did settlement talks begin in earnest. (*See* Dkt. 61, ¶ 12.) Even then, the Parties negotiated the principal terms of the Settlement for five months before executing a binding memorandum of understanding, spent another three months finalizing the original settlement agreement, then spent several weeks re-negotiating several terms, like the scope of the release, in the Amended Settlement Agreement. (Ufkes Decl. ¶ 7.)

14

The arm's-length nature of these negotiations is further confirmed by the Settlement itself: it is non-reversionary, provides significant cash payments to class members who submit a simple, valid Claim Form, and contains no provisions that might suggest fraud or collusion, such as "clear sailing" or "kicker" clauses regarding attorneys' fees. *See Snyder*, 2019 WL 2103379, at *4 (approving settlement where "there is no provision for reversion of unclaimed amounts, no clear sailing clause regarding attorneys' fees, and none of the other types of settlement terms that sometimes suggest something other than an arm's-length negotiation"). For these reasons, there should be no question that the Settlement here was the result of good-faith negotiations free from fraud or collusion. *See Schulte v. Fifth Third Bank*, No. 09-CV-6655, 2010 WL 8816289, at *4 n.5 (N.D. Ill. Sept. 10, 2010) (noting that courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered").

## C.    The Settlement Treats Class Members Equitably

Next, Rule 23(e)(2) requires the proposed settlement to treat class members "equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As the Advisory Committee noted, the apportionment of relief among the class should take "appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2)(D), Advisory Committee's Note to 2018 Amendment. In fact, "an agreement that gives the same monetary remedy to all members of the class, despite significant differences in the nature of their claims . . . may not be fair and reasonable." *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 346 (1st Cir. 2022) (quoting PRINCIPLES OF THE L. OF AGGREGATE LITIG. § 3.05 cmt. b (Am. L. Inst. 2010)).

Here, the Parties carefully structured the Settlement to fairly reflect the circumstances of different claimants. As noted above, BIPA exempts "financial institution[s]" and their "affiliates"

from liability, but the interpretation of those terms remains a point of controversy. *See* 740 ILCS 14/25(c). Because that defense has gone largely untested in this context, it is uncertain whether certain Onfido customers would qualify as "financial institution[s]," whether Onfido would qualify as an exempted "affiliate," or whether making Onfido comply with BIPA would impermissibly subject its financial-related customers to BIPA "in any manner." *See Davis v. Jumio Corp.*, No. 22-CV-00776, 2023 WL 2019048, at *4-5 (N.D. Ill. Feb. 14, 2023) (on 12(b)(6) motion, rejecting defendant-software vendor's argument that because its software is embedded and integrated into its financial-related customer's app, subjecting defendant to BIPA would require altering the operation of the customer's app, which would impermissibly apply BIPA to the customer "in any manner," and finding the argument premature before discovery). To ensure that class members would recover a monetary award commensurate with the merits of their respective claims, Class Counsel proposed two classes of Illinois residents whose biometrics were collected by Onfido: one for users of financial services apps (the FI Class), and one for all other users (the NFI Class). (Agreement §§ 1.17, 1.23.)

"[T]here is nothing wrong with negotiating different damages awards for different subclasses, so long as the difference is based on legitimate considerations." *Follansbee v. Discover Fin. Servs., Inc.*, No. 99 C 3827, 2000 WL 804690, at *3 (N.D. Ill. June 21, 2000). The different sizes of the FI Class Settlement Fund (approximately $12.8 million for around 410,418 class members) and the NFI Class Settlement Fund (approximately $15.7 million for around 199,012 class members) reflect Class Counsel's assessment of the potential obstacles to recovery for each group and the one unique defense to the FI Class. The two-class structure of the Settlement provides for a global resolution, while ensuring that class members are properly compensated according to their likelihood of recovery. *See Murray*, 55 F.4th at 346 ("Significant differences in

16

contested claims or defenses have the potential to cause significant differences in claim value, which should be reflected in any fair settlement.")

In all other material respects, the Settlement treats all class members identically. Both funds are non-reversionary, and members of both classes will receive their *pro rata* cash payments on the same rolling schedule (depending on whether they select e-payments or checks), after fees and costs are paid from their respective funds. (Agreement § 2.1(c)-(d)); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999) (where class members are similarly situated with similar claims, equitable treatment is "assured by straightforward pro rata distribution of the limited fund").

Moreover, the Agreement provides uniform prospective relief that protects members of both classes. The Settlement requires Onfido to maintain a retention schedule for biometric data going forward, destroy all biometric data in its possession pursuant to that policy, provide a BIPA-compliant notice and consent form (including via its SDK) to customers that have Illinois-resident users, and confirm annually for two years that those customers are obtaining consent and otherwise complying with BIPA. (Agreement § 2.4.) Further, members of both classes will release the same claims against Onfido, while preserving all claims against Onfido's customers who subjected them to identify verification. (*Id.* §§ 1.32-1.33, 3.1.) Because the Settlement divides monetary relief fairly between the two classes, treats class members within each class identically, and affords the same prospective relief across the board, it satisfies Rule 23(e)(2)(D)'s equitable treatment requirement.

### D. The Relief Secured for the Settlement Class is Adequate and Warrants Final Approval

The final and most crucial factor under Rule 23(e)(2) scrutinizes whether the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2)(C). In making this determination, Rule 23 identifies several sub-factors, including (i) the cost, risks, and delay of trial and appeal; (ii) the

effectiveness of the proposed method of distributing relief to the class; and (iii) the terms of any proposed award of attorneys' fees, including timing of payment. *Id.*[3] This analysis necessarily encompasses two of the Seventh Circuit's factors: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; [and] (2) the complexity, length, and expense of further litigation[.]" *Wong*, 773 F.3d at 863 (internal citations omitted). The first Seventh Circuit factor, balancing the quality of the settlement against the strength of the merits case, "[is the] most important factor relevant to the fairness of a class action settlement[.]" *In re AT & T*, 789 F. Supp. 2d at 958 (N.D. Ill. 2011) (internal quotations omitted). This Settlement meets that standard, and provides more-than-adequate relief.

### 1. The Relief Provided by the Settlement is Excellent

The Settlement provides outstanding monetary relief for the Settlement Classes and excels when compared to similarly sized class action settlements, including those under BIPA. Onfido will pay $28.5 million between two settlement funds: $15,714,404.10 to the NFI Class Settlement Fund for the benefit of approximately 199,012 members, and $12,785,595.90 to the NFI Class Settlement Fund for the benefit of approximately 410,418 members. (Kamenir Decl. ¶ 6; Ufkes Decl. ¶ 10.) At claims rates of 18.3% for the NFI Class and 20.1% for the FI Class, each NFI Class Member with an Approved NFI Class Claim will receive about $279, and each FI Class Member with an Approved FI Class Claim will receive about $95.

Recoveries in many other statutory privacy class actions fall well short of those figures. Such settlements all too often secure *cy pres* relief without any individual payments to class members. *See, e.g.*, *In re Google LLC St. View Elec. Commc'ns Litig.*, 611 F.Supp.3d 872, 890

---

[3]       The fourth sub-factor, which requires the parties to identify any side agreements made in connection with the settlement, is inapplicable as there are no such agreements. Fed. R. Civ. P. 23(e)(2)(C)(iv); (Declaration of Schuyler Ufkes, ("Ufkes Decl."), at ¶ 8, attached as Exhibit 2.)

(N.D. Cal. 2020) (approving, over objections of class members and state attorney general, a settlement providing only *cy pres* relief for violations of a federal privacy statute, where $10,000 in statutory damages were available per claim). This has been true in finally-approved settlements in the BIPA context as well, where some settlements have offered only credit monitoring to class members, with *no* monetary relief. *See Carroll v. Crème de la Crème, Inc*., 2017-CH-01624 (Cir. Ct. Cook Cnty. June 6, 2018). And of the BIPA settlements that have provided monetary relief, some have unnecessarily capped the amount class members can receive and reverted the inevitable remaining funds back to the defendant, rather than distributing the fund *pro rata* to class members. *E.g.*, *Rosenbach v. Six Flags Ent. Corp.*, 2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) (approving $36 million reversionary fund for approximately 1,110,000 class members, which capped class member payments at $200 or $60 depending on date of finger scan and reverted unclaimed funds to defendant); *Lark v. McDonald's USA, LLC*, No. 17-L-559 (Cir. Ct. St. Clair Cnty. Feb. 28, 2022) (approving $50 million reversionary fund for more than 175,000 class members, which capped class member payments at $375 or $190 depending on date of finger scan and reverted tens of millions of dollars in unclaimed funds to defendants).

This Settlement stands in stark contrast. *Both* of the non-reversionary settlement funds here offer per-person relief that is consistent with or exceeds the recovery in other large BIPA settlements. *See Boone v. Snap, Inc.*, 2022-LA-000708 (Cir. Ct. Dupage Cnty. Nov. 22, 2022) ($35 million fund for approximately 3.8 million class members); *Kusinski v. ADP, LLC*, 2017-CH-12364 (Cir. Ct. Cook Cnty. Nov. 19, 2021) ($25 million fund for approximately 320,000 class members); *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($7 million fund for approximately 260,000 class members); *Miracle-Pond v. Shutterfly, Inc.*, 2019-

CH-07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ($6.75 million fund for potentially millions[4] of class members) *Thome v. NOVAtime Tech., Inc.*, No. 19-cv-6256, Dkt. 90 (N.D. Ill. Mar. 8, 2021) ($4.1 million fund for approximately 62,000 class members, and assignment of insurance policy).

This monetary relief is even more remarkable considering that vendor claims are commonly released in BIPA cases against direct collectors for no value in return—that is, with no separate payment for the vendor's separate BIPA violations or promise of injunctive relief. *See, e.g.*, *Bryant v. Compass Group USA, Inc.*, No. 19-cv-06622, Dkt. 90 (N.D. Ill. Nov. 2, 2021) (preliminarily approving $6.8 million settlement for 66,159 class members, releasing both the vendor of the biometric technology and all of its customers); *but see Crumpton v. Octapharma Plasma, Inc.*, 19-cv-08402 (N.D. Ill. Feb. 16, 2022) (carving out third-party vendor, Haemonetics, from release in BIPA settlement secured by Edelson PC).

To that end, the Settlement expressly preserves class members' BIPA claims against Onfido's customers—the applications who subjected them to the identity verification technology at issue. (Agreement § 1.33.) This carve-out enables class members to fully vindicate their privacy rights under BIPA; a narrow release can be extremely valuable where possible claims exist against both the companies that end users interacted with and the software vendor. *See, e.g.*, *Crumpton v. Octapharma*, 1:19-cv-08402, Dkt. 92 (N.D. Ill. Feb. 16, 2022) (approving $9 million BIPA settlement against blood plasma company, with narrow release that allowed class members to pursue second case against the vendor that is on the cusp of another class-wide settlement in *Crumpton v. Haemonetics Corporation*, 1:21-cv-01402, Dkt. 60 (N.D. Ill. Aug. 23, 2023).

---

[4]     The settlement papers submitted in *Miracle-Pond* represented that there were approximately 954,000 class members, but that number only counted Shutterfly *users* in Illinois; it did not include the vast number of *non-users* who appeared in users' photographs uploaded to Shutterfly and who were included in the settlement class definition.

The Settlement affords both the NFI Class and FI Class robust monetary recovery, while preserving valuable claims against other potential defendants. By the standards of large BIPA vendor cases, that relief is outstanding and should be approved.

> **2.** **_The Cost, Risk, and Delay of Further Litigation Compared to the Settlement's Benefits Favors Final Approval_**

"As courts recognize, a dollar obtained in settlement today is worth more than a dollar obtained after a trial and appeals years later." *Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *4 (N.D. Ill. Oct. 10, 1995). In evaluating the adequacy of the relief provided to the class, courts should first compare the cost, risks, and delay of pursing a litigated outcome to the settlement's immediate benefits. Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 amendment. The Settlement here meets both the 23(e)(2)(C) requirements and the Seventh Circuit's first and second factors because it provides adequate relief while allowing "the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte I*, 805 F. Supp. 2d at 586. While Plaintiffs believe that they could have prevailed, there were significant risks to recovery.

In particular, if litigation were to continue, Onfido would likely raise several legal and factual arguments which have never been clearly tested at the summary judgement or trial phase. First, Defendant would likely dispute that its software collects "scans of face geometry" within the meaning of BIPA. Litigating that issue would require costly expert discovery and (most likely) a jury trial with an uncertain outcome. *In re Facebook Biometric Info. Priv. Litig.*, No. 3:15-CV-03747-JD, 2018 WL 2197546, at *2–3 (N.D. Cal. May 14, 2018) (denying motion for summary judgment on whether facial scans were biometric data regulated by BIPA). Second, Onfido would continue to argue that its conduct was "reasonable," and thus not "negligent" or "willful" enough to create liability. Plaintiff has already argued in this case that there is no requirement to plead a

BIPA defendant's state of mind, but Onfido would certainly re-raise the issue at summary judgment or trial. Finally, litigating the case might pose difficult questions about when BIPA liability for an out-of-state company represents an inappropriate "extraterritorial" application of Illinois law. Multiple BIPA defendants have raised that defense, and courts have ruled both ways. *Compare Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019), *with McGoveran v. Amazon Web Servs., Inc.*, No. 20-1399-LPS, 2021 WL 4502089, at *4 (D. Del. Sept. 30, 2021).

Even if these uncertain issues were decided in Plaintiffs' favor, the class would have to expend significant resources to litigate the issue of class certification—a reality that the Advisory Committee notes to amended Rule 23(e) suggest that courts should consider when evaluating the risks and benefits of a proposed class settlement. While Plaintiffs believe that they would ultimately prevail on certification issues given Defendant's uniform conduct, class certification is still a significant hurdle and presents a risk to any class recovery. Even if adversarial class certification were granted, the possibility of an interlocutory appeal would still cloud recovery. *Cf. Patel v. Facebook, Inc.*, 932 F.3d at 1277 (in BIPA case, affirming class certification on interlocutory appeal that pended for over a year).

And even if Plaintiffs prevailed at summary judgment or trial, Defendant would have several avenues to argue for a reduction in damages. For instance, it might argue that any statutory damages award violates due process. *See, e.g.*, *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 963 (8th Cir. 2019) (statutory award in TCPA class action of $1.6 billion reduced to $32 million); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1125 (9th Cir. 2022) (in TCPA case, vacating district court's denial of defendant's post-trial motion challenging the constitutionality of $925 million statutory damages award under TCPA and remanding for further proceedings); *but see United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020), *cert. dismissed*, 141 S. Ct. 729

(2021) (statutory award of $280 million for violating various telemarketing statues over 65 million times did not violate due process). Onfido could also press for a discretionary reduction of BIPA's statutory damages—a possibility recently suggested by the Illinois Supreme Court. *See Cothron v. White Castle System, Inc.*, 2023 IL 128004, ¶ 42 (noting that a court assessing BIPA damages is a "creature of equity" with discretion to adjust damages awards). Though Plaintiffs might have scored an astronomical damages award for the class at trial, it could be dramatically reduced. *See Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2023 WL 4297654, at *10 (N.D. Ill. June 30, 2023) (vacating pre-*Cothron* damages award of $5,000 per class member and ordering new trial for jury to determine the amount of damages).

In short, continuing the case might provide "Class Members with either no in-court recovery or some recovery many years from now . . ." *In re AT & T*, 789 F. Supp. 2d at 964. In view of the substantial risks, expense, and delay that would accompany further litigation, the Settlement offers substantial value relative to the strength of Plaintiffs' case—particularly when compared to similar BIPA class action settlements. This crucial factor therefore strongly supports final approval.

### 3. The Method of Distributing Relief to the Class Members is Effective and Supports Final Approval

The "effectiveness of [the]…method of distributing relief to the class" weighs strongly in favor of the adequacy of this Settlement under Rule 23(e)(2)(C)(ii). An effective distribution method "get[s] as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." 4 NEWBERG ON CLASS ACTIONS § 13:53 (6th ed. 2023).

Here, up until October 6, 2023, class members could submit a claim either by mail or online. Those who submitted online had the option to select to receive their settlement payment by

Venmo, Zelle, Paypal, or check; those who submitted an approved claim by mail will receive a check in the mail and can update their address at any time on the Settlement Website. As further detailed below, the parties achieved outstanding claims rates of 18.3% for the NFI Class and 20.1% for the FI Class, which is strong evidence that the claims process here was effective.

As described above, the Agreement provides for an extended payment period to maximize the total recovery of both classes. Electronic payments will issue in four installments over three years, and mailed payments will issue in two installments. (Agreement § 2.1(c)-(d).) While this method delays full payment, it is a creative solution to obtain a larger overall recovery without imposing additional administrative burdens on class members. The Settlement also creates incentives to ensure that Defendant makes every payment on schedule. The Agreement subjects Onfido to a 9% interest rate for any late payments. (Agreement § 2.3.) Additionally, if Onfido misses an installment payment by more than 120 days, the release becomes void and Onfido gets no refund for money already paid into the fund. (*Id.*)

If the Settlement is approved, the Settlement Administrator will distribute the first round of settlement payments to each NFI Class Member and FI Class Member with an approved claim for their *pro rata* portion from the relevant fund. Each round of payments carries a 180-day void date. If any class members do not cash their first check or any of the first three e-payments are unable to be delivered by the void date, those payments will go back into the fund from which they were dispersed for *pro rata* distribution among the next round of payments. (*Id.* 2.1(g).) If any class members do not cash their second check or are unable to receive their fourth e-payment, those payments will go back into the fund from which they were dispersed for *pro rata* redistribution among class members who cashed their first check or successfully received at least one e-payment. (*Id.* § 2.1(h).) If redistribution is not feasible, or if there are residual funds

remaining after redistribution, the Settlement Administrator will distribute those funds to the Unclaimed Property Division of the Illinois Treasurer's Office, subject to approval by the Court, where class members can claim their funds. (*Id.* § 2.1(i).) Alternatively, the Court may choose a *cy pres* recipient for any final residual funds. (*Id.*) This well-recognized method of distributing monetary relief fully satisfies this aspect of Rule 23(e)(2)(C)(ii).

### 4. The Terms of the Requested Attorneys' Fees are Reasonable.

The third and final relevant sub-factor considers the adequacy of the relief provided to the class, in view of "the terms of [the] proposed award of attorney's fees, including timing of payment[.]" Fed. R. Civ. P. 23(e)(2)(C)(iii).

After the Settlement Classes received Notice, Class Counsel petitioned the Court for an award of reasonable attorneys' fees on September 18, 2023. (Dkt. 81.) The Settlement's method of calculating attorneys' fees (i.e., the percentage-of-the-fund method) and Class Counsel's request for thirty-three percent (33%) of each non-reversionary fund are standard terms. (Agreement § 8.1.) The percentage-of-the-fund method has been used to determine a reasonable fee award in every BIPA class action settlement creating a common fund to date. The requested percentage fee award is well in line with—if not on the low end of— common fund fee awards in BIPA cases in this District. *See*, *e.g.*, *Vaughan v. Biomat USA, Inc.*, 20-cv-04241 (N.D. Ill. Sept. 19, 2023) (awarding 33.3% of $16.75 million fund) (Aspen, J.); *In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 939-943 (N.D. Ill. July 28, 2022) (awarding 33% of $92 million fund) (Lee, J.); *Crumpton*, No. 19-cv-08402, Dkt. 92 (awarding 33% of $9.9 million fund) (Kendall, J.); *Alvarado v. Int'l Laser Prods., Inc.*, No. 18-cv-7756, Dkt. 70 (N.D. Ill. Jan. 24, 2020) (awarding 35% of $895,788.74 fund) (Pallmeyer, J.); *Neals v. ParTech, Inc.*, No. 19-cv-05660, Dkt. 140

25

(N.D. Ill. July 20, 2022) (awarding 35% of $790,000 fund) (Valderrama, J.). Accordingly, Class Counsel's request for 33% of the net fund in attorneys' fees is reasonable.

Finally, the Agreement provides that Class Counsel will be paid any attorneys' fees on the same staggered schedule and in the same proportion as class members are paid. (Agreement § 8.2.) For example, if the Court awards 33% in fees, Class Counsel will be paid 33% of the amount distributed to class members each time payments are distributed to class members. Thus, Class Counsel share any risks of Defendant's future nonpayment with the class members. These terms are reasonable and should be approved.

### E. The Remaining Considerations Set Forth by the Seventh Circuit Support Approval of the Settlement

In addition to the requirements that overlap with those now required by Rule 23(e), the Seventh Circuit requires a few additional considerations: the class's reaction to the settlement, the opinion of competent counsel, and whether the settlement raises any red flags that courts should be wary of. *Wong*, 773 F.3d at 863. Here, the positive reaction of the Settlement Classes, the support of counsel, and the lack of red flags all favor approval.

#### 1. The Reaction of the Settlement Class Favors Approval

The Court-approved Settlement Administrator diligently implemented the Notice plan outlined in the Agreement and the objection, exclusion, and claims deadlines have passed with an overwhelmingly positive reaction from the Settlement Classes. The rates at which class members participated in the settlement by submitting claims is the best indicator of a class's reaction to a settlement. *See Eubank v. Pella Corp.*, 753 F.3d 718, 728 (7th Cir. 2014) ("[A] low opt-out rate is no evidence that a class action settlement was 'fair' to the members of the class.") Here, that 36,479 NFI Class Members and 82,538 FI Class Members submitted approved claims—imputing strong claims rates of 18.3% for the NFI Class and 20.1% for the FI Class—indicates a robust positive

26

reaction from the Settlement Classes. *See Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, FED. TRADE COMM'N, 11 (Sept. 2019), https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf ("Across all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (*i.e.,* cases weighted by the number of notice recipients) was 4%."). Indeed, the rate at which class members participated in this Settlement is in line with, and in many instances surpasses, similar BIPA settlement approved to date. *See In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 620 (N.D. Cal. 2021) (22% claims rate); *Crumpton*, No. 19-CV-08402, Dkt. 92 (20.6% claims rate); *Sekura v. L.A. Tan Enters., Inc.*, 2015-CH-16694 (Cir. Ct. Cook Cnty. Dec. 1, 2016) (15% claims rate); *Kusinski*, 2017-CH-12364 (12.7% claims rate); *Thome*, No. 19-cv-6256, Dkt. 90 (10% claims rate); *Prelipceanu*, 2018-CH-15883 (5% claims rate).

The negligible percentage of opt-outs and objections further suggests a favorable reaction. Of the hundreds of thousands of individuals who received direct Notice of the Settlement, just one person (an FI Class Member) objected to the Settlement, and only 6 NFI Class members and 18 FI Class members requested exclusion. (Kamenir Decl. ¶ 28.) In other words, 0% of the NFI Class and 0.0002% of the FI Class objected, and only 0.003% of the NFI Class and 0.004% of the FI Class requested to be excluded. *See Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 495 (N.D. Ill. 2015) (describing 20 objections out of a class of 10 million "a low level of opposition [that] supports the reasonableness of the settlement"); *In re Capital One Telephone Consumer Protection Act Litig.*, 80 F.Supp.3d 781, 792 (N.D. Ill. 2015) (finding opt-out and objection rate of 0.0032% low enough to support settlement); *In re Sw. Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) (finding an opt-out and objection rate of less than 0.01% supportive of

the reasonableness of settlement); *In re AT&T*, 789 F.Supp.2d at 965 (N.D. Ill. 2011) (same).

The sole objection from J. Mor.[5]—who is a FI Class Member—should be overruled for several reasons. (*See* J. Mor. Objection ("Mor. Obj."), attached as Exhibit L to the Kamenir Decl.) To start, it does not comply with virtually any of the objection requirements set forth in the Court's preliminary approval order. The objection is not signed, was not filed with Court, and did not include any of the information required in paragraph 14 of the preliminary approval order. (Dkt. 73.) For this reason alone the objection should be overruled. *See T.K. v. Bytedance Tech. Co., Ltd.*, No. 19-CV-7915, 2022 WL 888943, at *23 (N.D. Ill. Mar. 25, 2022), *appeal dismissed*, No. 22-1686, 2022 WL 19575674 (7th Cir. Aug. 22, 2022) (disregarding objections that failed to comply with the procedural requirements of the preliminary approval order); *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1304 (S.D. Cal. 2017), *aff'd*, 881 F.3d 1111 (9th Cir. 2018) ("[T]he Court may overrule an objection solely for failure to comply with the procedural requirements for objecting to the Settlement[.]").

But even if the Court considers the objection, it is meritless and provides no grounds warranting the denial of final approval. Frankly, the objection is difficult to follow. Objector Mor. believes he should be paid more than other FI Class Members because, according to him, "since this breach has happened I have had bank accounts started over seas and even had to deal with the FBI about bank fraud in my name over seas" and "found out my identity was stolen or used because the FBI went to a[n] Illinois pawn shop that I use to get a picture of me from the ID used to do a pawn loan because my name was flagged in the [NCIC] data base as a wanted criminal." (*See* Mor.

---

[5] The Settlement Agreement requires the Settlement Administrator to keep all contact information of the Settlement Classes confidential, except that, in the event of an objection or exclusion, the Administrator may disclose the class member's unique Claim ID, the first letter of the person's first name, and the first three letters of the person's last name. (Agreement §§ 4.1(c), 5.1(d).)

28

Obj.) As an initial matter, an "objection [that] simply argues that the amount awarded to Class Members should be increased… is 'tantamount to complaining that the settlement should be 'better,' which is not a valid objection." *Schulte I*, 805 F. Supp. 2d at 595.

In any event, Objector Mor. presents no evidence that there was an actual breach of Onfido's data, that his identity was actually stolen, or that Onfido caused any of his claimed injuries—it's all speculation. Even if Objector Mor. thinks Onfido had enough data to allow a fraudster to start "bank accounts … over seas" in his name and that the data was breached (again, there's no evidence of either), he can still bring those claims because any such disclosure is not covered by the settlement. *See In re Nat'l Collegiate Athletic Ass'n*, 332 F.R.D. at 219–20 (explaining that various objections misunderstood the scope of the settlement's release, and overruling objectors who could still bring their individualized claims); *In re Mexico Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1033 (N.D. Ill. 2000) (overruling objections that raised claims "which are not the subject of this litigation and are unaffected by the proposed settlements."); *see also Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2013 WL 4610764, at *11 (N.D. Cal. Aug. 28, 2013) (overruling objection for lack of specificity where objector claimed he "'got severe damages & mental anguish' and that Verizon 'turned in incorrect credit reports ... ruining his credit for years'"). Rather, the Settlement only releases claims arising from or related to Onfido's disclosure of face scans, retina or iris scans, and voiceprints (and information derived therefrom) ("Released Biometrics"), not any other personally identifying information that would be required to open foreign bank accounts.

To the extent Objector Mor. is complaining about the Settlement releasing claims arising from Onfido's disclosure of Released Biometrics, the Settlement provides outstanding relief for these claims in light of the substantial risks faced by the FI Class, as explained above. *See, e.g.*, *In*

29

*re Google Plus Profile Litigation*, No. 5:18-cv-6164-EJD, 2021 WL 242887, at *5 (N.D. Cal. Jan. 25, 2021) (approving settlement that provided, on average, only $2.50 per claimant where class members actually had their non-public profile information exposed). Accordingly, if the Settlement is approved, Objector Mor. will be paid under the Settlement (since he submitted a valid claim) and will retain the claims he seems concerned about in his objection. (Kamenir Decl. ¶ 31.)

Even though Objector Mor. was sent (1) the postcard notice, (2) the email notice, (3) the first reminder email notice, and (4) the second reminder email notice, (*Id.* ¶ 31), he complains that the original postcard notice he received didn't "totally explain[] [his] options." Not so. The postcard notice tells class members all their options, including submitting a claim, doing nothing, objecting to the Settlement, or requesting exclusion. The postcard further points class members to "the Internet Notice (FAQs 13 & 16), available at www.OnfidoBIPASettlement.com" for "detailed requirements and instructions on how to exclude yourself or object." These pincited FAQs on the website provide everything a class member needs to know to object or opt out. *Mangone v. First USA Bank*, 206 F.R.D. 222, 233 (S.D. Ill. 2001) (overruling objection to summary notices because they directed class members where to obtain more information about the settlement).

Finally, another FI Class member with the initials C. Nel. submitted what the Parties interpret as a request for exclusion that expresses dissatisfaction with the payment amount per claimant. (*See* Kamenir Decl., at Exhibit J.) The Parties understand this to be a request for exclusion because it states "I do not give up my rights to sue[,]" and C. Nel. did not submit a claim for payment. *See* Rossman et al., *Consumer Class Actions: A Practical Litigation Guide*, § 15.5.11 (2023) (explaining that when an objector claims their "particular individual claims are not being adequately compensated by the settlement because of their peculiar circumstances[,]" their

30

solution is to opt-out of the settlement and pursue those claims individually). To the extent the Court considers this an objection as to the settlement amount, Plaintiffs again point the Court to the analysis above in response: given the substantial risks faced by the FI Class if litigation continued, the monetary relief secured for the FI Class is outstanding. *See Charvat v. Valente*, No. 12-CV-05746, 2019 WL 5576932, at *6–7 (N.D. Ill. Oct. 28, 2019) (in TCPA case, overruling objections as to the anticipated per-claim payment where each unlawful call was settled for between $7.41 and $8.42 and statute provided for damages of $500 to $1,500 per unlawful call).

### 2.     *Experienced Counsel's Belief that the Settlement is Beneficial to the Class Weighs in Favor of Final Approval*

While the Seventh Circuit has expressed skepticism about the weight of this factor, *see Pearson*, 772 F.3d at 787, the opinion of competent counsel also supports final approval of the Settlement. Where class counsel has "extensive experience in consumer class actions and complex litigation[,]" their "belie[f] that the [s]ettlement is beneficial to the [c]lass" supports approval of the settlement. *Schulte I*, 805 F. Supp. 2d at 586; *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (finding plaintiff's counsel competent, and their endorsement of a settlement thus supporting approval, where counsel were "experienced and skilled practitioners in the [relevant] field, and [were] responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted") (internal quotations omitted).

Here, as discussed at length in Plaintiffs' motion for preliminary approval (Dkt. 69), Class Counsel are competent to give their opinion on this Settlement. Put simply, and for the reasons discussed above, Class Counsel believe that the Settlement provides outstanding monetary and prospective relief without the uncertainty and delay that years of additional litigation would bring. (Ufkes Decl. ¶ 9.) That is certainly in the best interest of the Settlement Classes. (*Id.*)

For these reasons, the opinion of Class Counsel weighs in favor of final approval.

### 3.      *The Settlement Raises No Red Flags*

Finally, the Settlement raises none of the red flags identified by the Seventh Circuit in analyzing class settlements. In *Eubank v. Pella Corp.*, the Seventh Circuit identified "almost every danger sign in a class action settlement that our court and other courts have warned district judges to be on the lookout for[.]" 753 F.3d at 728. Those signs included (i) a single class containing two adverse subgroups, (ii) a familial relationship between class counsel and the class representatives, (iii) failure to establish the amount of class member recovery, (iv) the reversion of any unawarded attorneys' fees to defendant, (v) an advance of attorneys' fees before notice of the settlement was provided to class members, (vi) a provision in the settlement agreement denying incentive awards to class representatives who objected to the settlement, (vii) providing some class members only coupons, and (viii) a complicated claims procedure creating substantial obstacles to recovery. *Id.* at 721-28.

Here, none of those problematic features are present. The Settlement creates two classes to avoid adverse interests within a single class and permit an equitable distribution of the settlement funds between class members based on the relative strength of each class's claims. The Class Representatives have no familial or other relationship with Class Counsel or any member of their respective law firm. The claims process here is simple and straightforward: class members were able to submit the short, one-page Claim Form either online through the Settlement Website, or by mail by submitting the postage-prepaid Claim Form that was attached to their original postcard notice. Any unawarded attorneys' fees from either fund will be distributed to FI Class Members and/or NFI Class Members who submitted approved claims, rather than reverting to Defendant (Agreement § 8.1); there has been no advance of attorneys' fees to Class Counsel; and there is no

provision in the Settlement Agreement denying an incentive award to a named plaintiff who does not support the Settlement.

The Settlement here is beneficial to class members and displays no warning signs that should give this Court pause. The Settlement should therefore be approved.

## VII.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order finally approving the Parties' Settlement and ordering such other relief as this Court deems reasonable and just. For the Court's convenience, Plaintiffs will submit a proposed final approval order to the Court's designated email address prior to the November 9, 2023 final approval hearing.

Respectfully submitted,

**FREDY SOSA** and **ROHITH AMRUTHUR**, individually and on behalf of all others similarly situated,

Dated: October 20, 2023

By: /s/ Schuyler Ufkes
*One of Plaintiffs' Attorneys*

J. Eli Wade-Scott
ewadescott@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378